628 A.2d 234

**CHESAPEAKE INDUSTRIAL LEASING COMPANY, INC.**

v.

**COMPTROLLER OF THE TREASURY.**

**No. 119, Sept. Term, 1992.**

Court of Appeals of Maryland.

June 8, 1993.

Reconsideration Denied July 21, 1993.

William M. Davidow, Jr. (Whiteford, Taylor & Preston, Baltimore), Robert E. Polack, Towson, all on brief, for appellant.

Deborah. B. Bacharach, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Sheldon H. Laskin, Gaylin Soponis, Asst. Attys. Gen., all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

In 1947, the Maryland General Assembly first enacted the Retail Sales Tax Act, the present form of which is now codified at Maryland Code (1988, 1992 Cum.Supp.), Tax–General Article, §§ 11–101 *et seq.* Under this original Act, leases of tangible personal property were not subject to sales tax. In 1955, however, the General Assembly amended the Act to include a lease of tangible personal property within the statutory definition of a "sale," thereby subjecting it to sales tax. *See* Chapter 332 of the Acts of 1955 (now codified at Md.Code (1988, 1992 Cum.Supp.), Tax–General Art., § 11–101(f)(1)); *Comptroller v. Pittsburgh–Des Moines Steel Co.,* 231 Md. 132, 145–46, 189 A.2d 107, 114–15, *cert. denied,* 375 U.S. 821, 84 S.Ct. 58, 11 L.Ed.2d 55 (1963). The instant case concerns the lease of such personal property in the form of office and other business equipment. While there is no doubt that such leases

are subject to sales tax, our task is to resolve two subsidiary issues: (1) the effect, if any, of the assignment of the lease on the lessor's statutory obligation to collect and remit sales tax, and; (2) the effect on the lessor's sales tax obligation, if any, of the lessees' failure to make lease payments as the lease requires.

## I.

The appellant, Chesapeake Industrial Leasing Company, Inc. (Chesapeake), is a Maryland corporation in the business of leasing office and industrial equipment. During the period at issue in this case, Chesapeake was the lessor in numerous lease transactions that generally came about in the following way:

(1) a business in need of equipment (a Customer) contacted Chesapeake to obtain the equipment through a lease, either because the business could not or did not want to purchase the equipment outright;

(2) Chesapeake determined whether the potential Customer was creditworthy and whether a financial institution would purchase an assignment of a lease with the Customer;

(3) if the financial institution agreed to purchase the lease, Chesapeake executed a lease with the Customer providing for a predetermined number of monthly lease payments, each payment comprising a rent component and a sales tax component;

(4) Chesapeake ordered the equipment from a supplier, who delivered it to the Customer;

(5) Upon the Customer's acceptance of the equipment, Chesapeake paid the supplier and took title to the equipment;[1]

---

**1.** Chesapeake did not pay sales tax to the supplier because it provided the supplier with a resale certificate indicating its intent to resell or, in this case, lease the equipment. *See* Md.Code (1957, 1988 Cum.Supp.), Article 81, § 333, *recodified at* Md.Code (1988, 1992 Cum.Supp.), Tax–General Article, § 11–408(b).

(6) Chesapeake assigned the lease to the financial institution and the financial institution paid Chesapeake for the assignment;

(7) In some cases, Chesapeake agreed to "service" the lease for the financial institution by receiving the lease payments and forwarding the rent component to the financial institution and the tax component to the Comptroller. In a few other cases, the Customer paid the financial institution directly.

In the transactions at issue in this case, Chesapeake's leases with Customers were assigned to Baltimore Federal Financial (BFF). Some assignments were recourse transactions accomplished via a "Security Agreement and Assignment of Lease," in which Chesapeake guaranteed payment of rent to BFF without requiring BFF to proceed against a defaulting lessee. Other leases were assigned via an "Assignment of Lease Without Recourse," under which the bank had no recourse against Chesapeake, as its assignor, if the lessee defaulted.

On September 20, 1988, the appellee, the Comptroller of the Treasury, Sales and Use Tax Division (Comptroller), issued a Notice of Assessment to Chesapeake for sales tax Chesapeake allegedly failed to remit on both recourse and non-recourse leases it had executed under the arrangement described above. Pursuant to that notice, the Comptroller levied an assessment in the amount of $21,417.18, plus interest and penalties. Chesapeake met informally with the Comptroller's office to request an abatement of the taxes in question. Shortly thereafter, the Comptroller denied the request. Chesapeake timely requested a formal hearing on its claim, at which it contended that because the lessees on the leases in question had failed to make their rent and sales tax payments, it was not required to remit sales taxes. Chesapeake asserted it was only required to remit sales tax on its leases on a cash basis, *i.e.*, as it received monthly payments of rent and sales tax. Therefore, Chesapeake argued, when the lessees did not pay sales tax to Chesapeake, Chesapeake was not required to remit sales tax to the State. The Comptroller countered that a lessor must remit tax payments on an accrual basis, *i.e.*,

when each lease payment is due, without regard to whether the lessee's payment is actually received. The hearing officer accepted the Comptroller's view and affirmed the assessment, interest, and penalties.

Chesapeake appealed to the Maryland Tax Court. The Tax Court found that Chesapeake was liable for the full amount assessed but was also entitled under the Comptroller's regulations to an offset of $8,444.99 for the recourse lease receivables Chesapeake had previously written off on its federal tax returns as uncollectible bad debt.[2] The Tax Court found that Chesapeake was not entitled to an offset with respect to the remaining lease receivables because those leases had been assigned without recourse and therefore Chesapeake incurred no bad debt liability for them as a result of the lessees' default. Chesapeake appealed to the Circuit Court for Baltimore County, where Judge Alfred Brennan affirmed the Tax Court's decision. Chesapeake appealed to the Court of Special Appeals, but this Court issued a writ of certiorari on its own motion before the intermediate appellate court could consider the case.

## II.

In this Court, Chesapeake makes several arguments. Acknowledging that the "vendor" is statutorily liable for collect-

---

**2.** Because the leases were assigned on a recourse basis, Chesapeake was liable to BFF for the amount of the lessees' default. Thus, although the leases had been assigned to BFF, the bad debt belonged to Chesapeake which had to compensate BFF for the loss. The Tax Court based this offset on former COMAR 03.06.01.01.A, promulgated by the Comptroller, which provided:

"When the vendor is unable to collect accounts receivable in connection with which he has already remitted the tax to the Comptroller, he may apply for a refund within 3 years of payment of the tax. This regulation shall apply only to accounts which are found worthless and charged off during the taxpayer's taxable year."

Although the regulation provides for a refund of taxes already paid, not for an offset against taxes owed, the Comptroller has not objected to the Tax Court's construction of the regulation. The current form of this regulation, now found at COMAR 03.06.03.07, explicitly permits a vendor to apply for a refund of taxes already paid *or* take a credit against taxes owed, now within 4 years of the payment of the tax.

ing and remitting sales tax, Chesapeake first contends that it is no longer the vendor because BFF assumed this role upon assignment of the lease. Alternatively, Chesapeake contends that even if it remained the vendor, its statutory obligation to remit sales tax ceased when the lessees failed to make their lease payments. Failing that, Chesapeake believes it is entitled to an offset for those uncollectible lease receivables written off by its assignee, BFF, in addition to those written off by Chesapeake itself. We address each of these contentions in turn, after addressing two preliminary matters.

First, we note that while the Retail Sales Tax Act was recodified in 1988, appearing now as Md.Code (1988, 1992 Cum.Supp.), Tax–General Art., §§ 11–101 to 11–712, the provisions in effect during the time of this assessment were those of Md.Code (1957, 1980 Repl.Vol.), Art. 81, §§ 324 to 371. Therefore, we apply the provisions of Article 81 to this case. Because we would not reach a different result under the recodified provisions, however, we make reference to the recodified provisions throughout our opinion where appropriate.

Second, we make clear that we are treating the taxable transactions in question solely as leases for sales tax purposes, not as installment sales or as financing transactions. The parties have not suggested an alternative treatment, and we proceed on that basis. Our analysis treats the transaction as two distinct events, a lease (the taxable transaction) and a subsequent and separate assignment of the lease. We now turn to the substance of Chesapeake's arguments.

## A.

■ Under Article 81, as under the present law, the identity of the "vendor" for sales tax purposes is critical. The statute imposes personal liability on the vendor for failure to collect sales tax from purchasers of tangible personal property and pay it over to the Comptroller. Md.Code (1957, 1980

Repl.Vol.), Art. 81, §§ 327 & 328.[3] In the context of the Retail Sales Tax Act, a vendor is defined as "any person selling property or rendering services" subject to sales tax. Art. 81, § 324(b).[4] As for the meaning of "selling," a "sale" is "any transaction whereby title or possession, or both, of tangible personal property is or is to be transferred by any means whatsoever for a consideration *including rental, [or] lease....*" § 324(d) (emphasis added).[5] Chesapeake admits that, for the period between the Customer's acceptance of the equipment and the assignment of the lease to BFF, it was the "vendor" under the statute, but contends that the assignment transferred the "vendor" status to BFF and thereby relieved Chesapeake of its obligations. We disagree.

The principal reason for our disagreement with Chesapeake's position is that Chesapeake misunderstands the source of the vendor's sales tax obligations. Chesapeake points to the assignments of the leases to BFF and argues that "there is no language in the Assignments burdening Chesapeake with continuing Sales Tax liability" where a customer defaults after an assignment. While this statement correctly describes the BFF assignments, it fails to take into account the true source of the vendor's obligation to collect and remit taxes. This obligation is clearly and directly imposed by statute. Under Article 81, § 328, "[t]he *vendor* ... shall be personally liable for the tax collected or required to be collected...."[6] We have previously said that this statute imposes "an absolute obligation on a vendor to collect and pay over to the Comptroller the money collected from the purchaser if it is available or the proper amount of his own money if it is not." *Rockower*

---

**3.** *Recodified at* Md.Code (1988, 1992 Cum.Supp.), Tax–General Art., §§ 11–403(a), 11–601(b)–(c).

**4.** *Recodified at* Md.Code (1988), Tax–General Art., §§ 11–101($l$)(1)(ii), 11–701.

**5.** *Recodified at* Md.Code (1988, 1992 Cum.Supp.), Tax–General Art., § 11–101(f)(1).

**6.** *Recodified at* Md.Code (1988, 1992 Cum.Supp.), Tax–General Art., § 11–601(c).

*Bros. v. Comptroller,* 240 Md. 379, 392, 214 A.2d 581, 588 (1965) (rejecting vendor's suggestion that statute made it only an involuntary trustee whose liability is limited to the exercise of due care).

This absolute legal duty of the vendor to collect and remit taxes cannot be assigned via a contract between the vendor and a third party because the purpose of the statute—insuring that the State will receive sales tax revenues by imposing absolute, personal liability upon the vendor—would be defeated if vendors could relieve themselves of personal liability by contracting it away. This is not to say that a vendor cannot delegate to a third party the duty of collecting and remitting sales taxes on its behalf, and seek indemnification should the third party fail to fulfill this obligation, but such a contractual arrangement does not alter the vendor's statutorily-imposed obligation to the State. As between the State and the vendor, the vendor remains liable to collect and remit the sales tax.

Finally, as an equitable matter, we note that when Chesapeake purchased the office equipment from its suppliers, it avoided paying taxes otherwise due by furnishing the suppliers with a resale certificate. Under the statute and regulations then applicable, the duty of a vendor to collect the sales and use tax from a buyer was waived if the buyer provided the vendor with a signed resale certificate. *See* Art. 81, § 333 and former COMAR 03.06.01.40.A.[7] The certificate permitted Chesapeake to avoid paying sales tax at the time of its purchase by certifying that the property was bought for the purpose of resale and that sales tax would be paid when it resold the property. It seems disingenuous that Chesapeake could take advantage of this waiver, without which it would surely have been required to pay taxes to its equipment suppliers, and then later seek to avoid paying the tax at all.

In light of the foregoing arguments, we believe that Chesapeake remained the vendor under the statute, even after the

---

7. The same is true today. *See* Md.Code (1988, 1992 Cum.Supp.), Tax-General Art., § 11–408(b), and updated regulations at COMAR 03.06.-01.14.

assignment, and therefore hold that it also retained its liability to collect and remit sales tax.

### B.

In the alternative, Chesapeake argues that, even if it remained the vendor after assignment of the leases, the lessees' subsequent default relieved it of its obligation to remit sales taxes to the Comptroller. We review the relevant statutory and regulatory authority upon which Chesapeake bases this contention.

As we have noted, since 1955 a lease of tangible personal property has been considered a "sale" for sales tax purposes. Art. 81, § 324(d).[8] Former § 327 created the vendor's legal liability to collect and remit sales tax payments on such "sales," providing that "[t]he tax shall be paid by the purchaser to the vendor as trustee for and on account of the State, and the vendor shall be liable for the collection thereof for and on account of the State."[9] Former § 329 then addressed the timing of the required collection:

"The tax hereby imposed shall apply and be collected by the vendor from the purchaser at the time the sale is made regardless of the time when the purchase price is paid and delivered; unless the Comptroller shall provide by regulation in the case of credit or installment sales for the payment of the tax upon collection of the price or installments of the price or at some other time."[10]

The Comptroller amplified these provisions and promulgated several regulations, in accordance with its statutory authori-

---

**8.** *Recodified at* Md.Code (1988, 1992 Cum.Supp.), Tax–General Art., § 11–101(f)(1).

**9.** *Recodified at* Md.Code (1988), Tax–General Art., §§ 11–403, 11–401(a).

**10.** *Recodified at* Md.Code (1988, 1992 Cum.Supp), Tax–General Art., § 11–403(a).

ty.[11] Among these regulations was former COMAR 03.06.01.-57, which provided, in pertinent part:

## ".57 Time of Collection.

A. A sale is a transaction for the present or future transfer of title or possession of tangible personal property, or for the performance of certain services, for a consideration, and the tax imposed on sales at retail applies when the transaction is entered into, regardless of when the consideration is to be paid, the tangible personal property is to be delivered, or the services are to be performed. Except as provided by this regulation,[12] the vendor shall collect the tax from the purchaser when the sale occurs. *A vendor shall collect the tax on rental or lease transactions in accordance with Regulation .73."* (Emphasis added).[13]

Former Regulation .73 (COMAR 03.06.01.73) provided, in pertinent part:

## ".73 Lease of Tangible Personal Property.

A. The transfer of possession, without regard to limitations upon the use, of tangible personal property for a consideration, by way of lease, rental, license to use, royalty or similar transaction, referred to in this regulation as a 'lease', is included within the statutory definitions of the terms 'sale' and 'purchase' and is thus subject to the tax in the absence of a specific exemption or exclusion.

B. Each lease payment period is considered a separate lease, and thus a separate sale, for the purpose of determin-

11. The Comptroller was and is authorized to "make, adopt and amend such rules and regulations as he shall deem necessary to carry out the provisions of this subtitle...." Md.Code (1957, 1980 Repl.Vol.), Art. 81, § 365(a) (recodified at Md.Code (1988), Tax–General Art., § 2–103).

12. Section B of Regulation .57 in effect at the time provided that, for certain credit or installment sales, the vendor could defer collection of tax until the earlier of: (1) when the property is delivered, or (2) when full payment is made. This provision is now found at COMAR 03.06.-01.21.B.

13. Now found at COMAR 03.06.01.21.

ing when the tax is to be collected or paid." [14]

For the most part, the parties do not disagree over the meaning and effect of the statutory and regulatory scheme. For example, they agree that the vendor must collect the tax at the time of the sale, except in cases of certain installment sales where the Comptroller may promulgate other regulations. They also agree that a "sale" is generally defined as the moment when the transaction is entered into, without regard to when payment or delivery is made. They disagree, however, about the meaning and effect of COMAR 03.06.01.73, set out above, which the Comptroller promulgated specifically to address leases of tangible personal property. In particular, the parties differ on the meaning of section 03.06.01.73.B, which identifies each "lease payment period" as a separate sale and, therefore, as the trigger for collection and remission of tax under the Statute.

Chesapeake's first argument is that if the lessees ceased paying rent, the leases ended, meaning there were no more "lease payment periods" and consequently no more "sales" to which the sales tax could apply as per COMAR 03.06.01.73.B. We need not address today the effect of lease termination upon a vendor's obligation to remit sales tax because there is no evidence that the leases in this case actually terminated. Chesapeake's lessees apparently remained in possession of the leased property, and so we presume the periodic payments remained due and the leases continued to exist. There is no indication that the leases were ever terminated or, alternatively, that they contained an automatic termination clause effective upon a lessee's failure to pay. In fact, the leases gave the lessor several different remedies in the event of a lessee's default, only one of which was the option of terminating the lease. Upon a lessee's default the lessor could, for example, sue to "enforce performance by Lessee"—an acknowledgment, it would appear, that the lease did not necessarily terminate upon the mere occurrence of a lessee's default. Accordingly,

---

14. Now found at COMAR 03.06.01.28.

we reject Chesapeake's initial argument that the "lease payment periods" marking the taxable "sale" ceased just because the lessees stopped making payments.

Chesapeake next argues that, even if the leases did not end, the statutory and regulatory scheme only requires the vendor to remit sales tax on a cash basis, *i.e.*, as tax payments are actually collected from the lessee. When the lessees failed to pay tax to Chesapeake, Chesapeake contends it was not required to remit tax to the Comptroller. In making this argument, Chesapeake necessarily construes the term "lease payment period" in COMAR 03.06.01.73.B (now COMAR 03.-06.01.28.B) to mean an *actual* lease payment. The Comptroller responds that "lease payment period" refers to the period itself, not the actual payment, and that as long as the lease has not been terminated, "lease payment periods" continued for the scheduled life of the lease. The Comptroller therefore contends that the tax is collectible on an accrual basis, regardless of whether the rent is paid or the tax collected in a particular month. By this reasoning, the tax on a monthly rental would simply be due each month. We find ourselves in agreement with the Comptroller's position.

In interpreting the language of administrative regulations, we generally employ the same rules applicable to the interpretation of statutes. *Messitte v. Colonial Mortgage Serv.*, 287 Md. 289, 293, 411 A.2d 1051, 1053 (1980). A cardinal rule of statutory interpretation is that ordinarily words are to be given their natural and usual meaning, considered with reference to the aim and objective of the statute. *Richmond v. State*, 326 Md. 257, 262, 604 A.2d 483, 485–86 (1992); *Harford County v. University of Maryland Med. Sys. Corp.*, 318 Md. 525, 529, 569 A.2d 649, 651 (1990). Where such words are unambiguous, and are consistent with the statute's purpose, they will be accorded their ordinary significance. *Mustafa v. State*, 323 Md. 65, 73, 591 A.2d 481, 485 (1991). Applying these basic principles, we first find that the words "lease payment period" in COMAR 03.06.01.73.B (now COMAR 03.06.01.28.B) unambiguously describe the peri-

od during which each payment is due, not the actual payment itself. Otherwise, the word "period" would have no meaning, and we always seek to construe a statute or regulation so that no word is rendered superfluous or meaningless. *Management Personnel Servs. v. Sandefur*, 300 Md. 332, 341, 478 A.2d 310, 315 (1984) (citations omitted).

■ Turning to the relationship of this plain language to the overall aims and objectives of the statutory and regulatory scheme, we also find that the Comptroller's interpretation which we accept is in furtherance of these broader objectives. The principal purpose of the statutory and regulatory scheme is, of course, to raise revenue for the State, but the particular purpose of the regulations is to ensure the regular and orderly collection of such revenues. Such regularity is partly ensured by requiring that sales taxes be remitted on an accrual basis, at regular intervals, according to the terms of the lease. Such accrual basis remission of taxes, for example, anticipates the possibility that a lessee might temporarily fall behind on its lease payments and then later make up the arrearage. In that case, the effect of accrual basis remission is the insulation of the State from the erratic payment pattern of a particular lessee.

Finally, the existence of former COMAR 03.06.01.01 and present COMAR 03.06.03.07 since 1947 strengthens our interpretation of the statutory and regulatory scheme as requiring the vendor to remit sales tax on an accrual basis. Former COMAR 03.06.01.01 clearly anticipated that vendors would be remitting taxes without regard to actual cash collections. It provided, in part:

> "A. When the vendor is unable to collect accounts receivable in connection with which he has already remitted the tax to the Comptroller, he may apply for a refund within 3 years of payment of the tax...." [15]

---

**15.** Present COMAR 03.06.03.07.A provides:

"A vendor is required to remit the sales and use tax on an accrual basis. If a vendor is unable to collect accounts receivable on which

This "refund rule" specifically ameliorates what might otherwise have been a substantial hardship on accrual basis vendors. Absent the refund rule, an accrual basis vendor would be unable to recover previously remitted taxes when its lessee was incapable of making any further lease payments. The refund rule preserves the accrual basis requirement, ensuring regular and steady sales tax collection, but also permits previously remitted sales tax to be refunded under some circumstances. We note that the present refund rule specifically states that "[a] vendor is required to remit the sales and use tax on an accrual basis . . . ." Present COMAR 03.06.03.07.A.

Turning to the limited case law in the area, Chesapeake seeks to convince us that it is required to remit taxes on a cash basis by relying on this Court's statement in an installment sale case, *Phillips v. Comptroller*, 224 Md. 350, 356, 167 A.2d 913, 916 (1961). At issue in *Phillips* was the sales tax liability of an installment seller of construction equipment. Then-existing COMAR 03.06.01.57 gave installment sellers the choice of paying the entire sales tax "on all their net taxable sales during the previous month" (on an accrual basis), or proportionately each month as the buyer paid the vendors (on a cash basis). The *Phillips* vendor paid the entire amount up front. When the buyer defaulted, the vendor repossessed the equipment, crediting the remaining value of the equipment to the buyer's debt and writing off the rest of the debt as uncollectible. The Comptroller denied the vendor's request for a refund of sales tax already paid because of an administrative regulation providing that "[w]hen any merchandise is repossessed, no tax shall be refunded."

The *Phillips* Court reasoned that it would be unfair for a vendor who remitted the full tax up front, on an accrual basis, to be unable to get a refund of taxes remitted, but not received from the buyer; while a vendor who, pursuant to the statute, elected to collect and remit taxes on a cash basis would have no such hardship and would be liable only for

the sales and use tax has been remitted, a credit may be taken or refund applied for within 4 years of the vendor's payment of the tax."

those tax payments actually received from the buyer. The Court therefore decided that the rule prohibiting refunds when merchandise is repossessed should be construed together with the then-existing "refund rule," Comptroller's Rule 1. Rule 1, like the present refund rule, provided that a vendor could seek a refund for taxes paid in full on those receivables which have clearly become uncollectible. The Court held that the vendor who paid taxes up front was in fact due a refund if it was able to show a full and complete compliance with Rule 1, "in which event, the vendor will be entitled to a refund in accordance with the provisions of said Rule 1." *Id.* at 357, 167 A.2d at 916. In response to the Comptroller's argument that the vendor was not due a refund, the Court observed:

> "If Section 329 authorizes the Comptroller to provide by regulation for the payment of the taxes at the time of the 'collection of * * * installments' by the vendor, and Rule 57 permits 'an arrangement under which the purchaser would pay a vendor' the tax at the time he (the purchaser) paid his installments, and certain of the installments are never paid, how can it seriously be argued that the vendor would be liable for taxes on the installments he never collected?"

*Id.* at 356, 167 A.2d at 916. Chesapeake seizes upon this language in *Phillips* to support its argument that a vendor must remit only on a cash basis. Chesapeake, however, makes too much of the Court's statement. The Court was merely illustrating why the refund rule must apply to those vendors who remitted taxes on an accrual basis, *i.e.*, to equalize their liability with the liability of those vendors who were able to, and elected to, remit taxes on a cash basis. Thus, as it relates to the instant case, *Phillips* stands only for the proposition that the Comptroller's refund rule permits a vendor who paid sales tax on an accrual basis to recover taxes it has previously remitted when it can demonstrate compliance with the refund rule's provisions. *Phillips* does not state, or even imply, that a lessor may remit sales taxes on a cash basis, as Chesapeake contends.

We also point out that any precedent based upon an installment sale analogy is of limited, if any, use. In fact, the

evolution of the installment sale's treatment seems to militate against the result for which Chesapeake contends in this case. Although the installment sale regulation as originally promulgated (and at issue in *Phillips*) indeed permitted vendors to utilize the cash basis, that regulation, Comptroller's Rule 57, was amended in 1965 to provide that:

> "No Vendor who sells, assigns or pledges his accounts receivable may use the collection method (b) [the cash basis] of paying such sales taxes. All such Vendors must pay the tax on an accrual basis (a)."

Comptroller's Sales & Use Tax Act Rules and Regulations, Effective August 18, 1965. In 1973, Rule 57 was again amended, completely removing the cash basis option:

> "Where a vendor chooses to extend credit or installment sales to his customers, such vendor is not relieved of the responsibility to collect the tax on the entire sales price and remit to the State on the twenty-first of each month the amount of tax due on all net taxable sales made during the previous month.
>
> Beginning with sales made on or after March 1, 1974, . . . any vendor who previously elected under prior regulations to collect and remit the tax on the cash basis . . . shall revert to the accrual basis. . . . "

Comptroller's Sales & Use Tax Act Rules and Regulations, Effective December 3, 1973. In 1980, the Rule was once again amended to provide installment sellers a deferral of tax payments in certain extremely limited situations. One such limitation was that the collection may not be deferred beyond the time of full payment for or delivery of the property. 7:9 Md.Reg. 849–50 (May 2, 1980). In the instant case, the property was delivered at the start of the lease, which would of course have permitted no deferral at all.

In light of the foregoing discussion, we hold that a vendor who is a lessor of tangible personal property must remit sales taxes on an accrual basis. We believe the vendor's ability to either seek reimbursement of previously remitted taxes or take a credit against other taxes owed, as provided for in the

Comptroller's refund rule, sufficiently mitigates any potential harshness arising from this holding.

## C.

■ Chesapeake's final argument concerns the application of the Comptroller's refund rule to the precise facts of this case. The Tax Court granted, and the circuit court affirmed, a refund of those sales taxes attributable to the recourse leases. In doing so, the Tax Court relied on the refund rule in former COMAR 03.06.01.01, which provided:

> "A. When the vendor is unable to collect accounts receivable in connection with which he has already remitted the tax to the Comptroller, he may apply for a refund within 3 years of payment of the tax. This regulation shall apply only to accounts which are found worthless and charged off during the taxpayer's taxable year." [16]

For those leases assigned with recourse, Chesapeake was able to write off the uncollected receivables as bad debt on its federal tax returns. Therefore, the Tax Court permitted the refund of sales tax related to the recourse leases.

With respect to the sales tax assessed on the nonrecourse leases, the Tax Court determined that Chesapeake was not entitled to any refund or offset. It observed that the nonrecourse nature of the leases precluded Chesapeake from writing off those lease receivables as bad debts on its federal tax returns, and it therefore held that the refund rule did not permit a refund of the related sales tax assessed. In its Memorandum of Grounds for Decision, the Tax Court stated:

> "[The refund rule] extends the refund (offset) only to the vendor and not to any subsequent assignee of the vendor.

---

16. The refund rule is now found at COMAR 03.06.03.07. Changes made by the present rule include extending the period in which a vendor may apply for a refund to 4 years, and permitting either an application for refund or the taking of a credit against other taxes owed. The present rule also provides that vendors who are required to file federal income tax returns may claim a credit or refund only for the amount of tax written off for federal income tax purposes.

[Chesapeake] is the vendor entitled to an offset if it reported a bad debt deduction for those unpaid accounts on its federal income tax returns. [Chesapeake] did not so report due to the fact it had no liability for any unpaid accounts. Those accounts were assigned to the bank. Losses incurred by accounts being unpaid were borne by the bank and only the bank can report those losses as bad debts." (Footnote omitted).

The Comptroller shares this view, pointing in particular to the refund rule's focus on the vendor, as well as the rule's condition that the regulation "shall apply only to accounts which are found worthless and charged off *during the taxpayer's taxable year.*" (Emphasis added).

Despite the plain language of the rule, Chesapeake asserts that it ought to be entitled to an offset for those amounts written off by its assignee, BFF, in addition to those amounts it wrote off itself. Chesapeake contends that the Tax Court's reading of the regulation is unreasonable because it results in an unfair windfall to the State. Under the Tax Court's reading, Chesapeake argues, the State is entitled to keep the sales tax revenues merely because a vendor chose to assign the lease on a nonrecourse basis. If, on the other hand, the vendor had not assigned the lease and then taken the write-off itself (as it would then have been eligible to do) the State would have been obliged to refund the taxes. We must leave the resolution of this particular question for a future date, however, because we can find no evidence in the instant case that BFF, the assignee, ever took such a write-off.

A vendor such as Chesapeake is subject to the statutory presumption that all sales in the State are subject to sales and use tax, and that "the burden of proving that a sale is not taxable hereunder shall be upon the vendor or the purchaser . . . ." Art. 81, § 333.[17] In the Comptroller's hearing, in the Tax Court, in the circuit court, and now in this Court, Chesapeake could only say that, to the best of its knowledge, BFF

---

**17.** *Recodified at* Md.Code (1988), Tax–General Art., § 11–103 (presumption now designated "rebuttable").

pursued collection on the nonrecourse leases and wrote off those that were uncollectible.  No BFF tax returns were introduced into evidence at any stage of the proceedings and nobody testified on BFF's behalf.  Even Chesapeake's vice president testified that the information he was providing was based exclusively upon his own "belief."  We recognize that obtaining documentation from BFF, in receivership at the time of these proceedings, might have been difficult.  Nonetheless, Chesapeake simply adduced insufficient evidence from which one could conclude that BFF ever wrote off as bad debt the leases assigned to it by Chesapeake.  Thus, even were we to construe the refund rule as permitting a vendor to obtain a refund upon proof that its assignee took the write-off, the complete absence of proof that BFF took such a write-off would prevent us from allowing such a refund to Chesapeake in the instant case.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED, COSTS TO BE PAID BY APPELLANTS.*