# MARYLAND GLASS CORPORATION *v.* COMP-TROLLER OF THE TREASURY

[No. 244, September Term, 1957.]

*Decided June 12, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Harrison M. Robertson, Jr.,* with whom were *Cable & Mc-Daniel* on the brief, for appellant.

*Joseph S. Kaufman, Assistant Attorney General,* and *Edward F. Engelbert, Staff Attorney, Retail Sales Tax Division,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a judgment of the Baltimore City Court affirming the action of the State Comptroller in denying a claim for tax refund by the Maryland Glass Corporation. The claim arose out of an adjusted deficiency assessment in the amount of $11,743.01, which was paid by the appellant under protest. Only part of the assessment is contested, in

the amount of $4,309.48, plus interest of $786.48, representing use taxes claimed to be due and owing for the period from January 1, 1949 through November 30, 1954. During that period the appellant, a Maryland corporation, engaged in the business of manufacturing glassware at its plant in Baltimore City, purchased certain machinery for manufacturing glassware from Hartford-Empire Company, a Delaware corporation, having its principal place of business at Hartford, Connecticut, for a total of $39,974.13. This machinery was already installed and in use at the Baltimore plant of the appellant. The appellant also paid to Hartford-Empire the sum of $175,500.00 in consideration of the cancellation and termination of outstanding leasing and licensing agreements covering the machinery and related patents, with release of the appellant's obligations thereunder including the payment of royalties. The refund sought is the amount of the Maryland Use Tax payable upon the use of the property acquired by reason of said payments aggregating $215,474.13. The appellant raises three questions:

1. Was the Maryland Use Tax inapplicable because of the exemption of "Casual and isolated sales by a vendor who is not regularly engaged in the business of selling tangible personal property,", contained in Code (1951), Art. 81, secs. 370 (b) and 322 (e)? (Cf. Code (1957), Art. 81, secs. 375 (b) and 326 (e).)

2. Was the use tax inapplicable because of the exemption of "Tangible personal property not readily obtainable in Maryland * * * used * * * in this State by a person engaged in * * * manufacturing * * * if such tangible personal property enters into the processing of * * * the product * * * which is manufactured * * *," contained in Code (1951), Art. 81, sec. 370 (f)? (This subsection was repealed by Chapter 332 of the Acts of 1955, but was in effect during the years to which the assessment is applicable.)

3. Was the use tax inapplicable because the cancellation and termination of the leasing and licensing agreements and release of the appellant's obligations thereunder, did not constitute "use * * * of tangible personal property purchased from a vendor within or without this State * * *," under

Code (1951), Art. 81, sec. 369? (Cf. Code (1957), Art. 81, sec. 373.)

The facts are stipulated. Prior to June 1, 1947, Hartford-Empire was the sole, absolute and exclusive owner of patents covering machinery of the type in question, which machinery it did not sell or offer for sale, but manufactured and supplied to various glassware manufacturers throughout the United States under leasing and licensing agreements. For many years Maryland Glass had used such machinery in its Baltimore plant. Hartford-Empire held title to, and serviced and repaired the machinery under the leasing agreements. Maryland Glass paid rental and royalty fees for the use of the machinery. In 1939 an anti-trust suit was filed in Ohio by the United States Department of Justice, and as a result of this litigation a final judgment was entered on May 23, 1947, in accordance with a settlement memorandum entered into by all the parties, including Maryland Glass. Under the terms of the judgment, Hartford-Empire was directed to offer for sale at any time to any lessee any of its machines then under lease, at a price representing the depreciated book value of each machine, as shown on the books of Hartford-Empire, provided the existing leasing and licensing agreements relative thereto were cancelled, and payment for the cancellation made, in accordance with a formula set forth in the schedule attached to the judgment, as a settlement and compromise of the rights and liabilities of the respective parties. Pursuant to this standing offer the appellant, at various times between January 1, 1949 and September 13, 1954, purchased the machines with which we are here concerned. In some instances the machines had been depreciated to zero or $1.00. Payments under the proviso were made concurrently with the transfer of title in each case, as required by the terms of the judgment. In each case, the purchases were made at the option of the appellant. In 1955 the appellant still held some machines which it had not purchased and on which it still paid royalties. There was no liquidation of the assets of Hartford-Empire. During the period in question, it sold to the appellant certain new machinery, as well as the leased machinery in question.

Treating contentions 1. and 3. together, we think it is clear that, while the judgment required Hartford-Empire to extend to the appellant the option to purchase the leased machinery, the sales in question were not "casual and isolated" sales, within the meaning of the language quoted. We see no reason to distinguish the sales of the machinery already installed from sales of new machinery, which are conceded to be not within the exemption. In *Comptroller of Treas. v. Thompson Trailer Corp.,* 209 Md. 490, 502, relied on by the appellant, the gravamen of the decision on the point was that the sale "was in conjunction with a complete liquidation of the only business of Maryland Engineering Company at the time of the sale," and never to be repeated. The property transferred in the instant case was tangible personal property, and the price paid for each transfer included not only the depreciated book value but an additional sum representing the value to the vendor of the cancellation of the outstanding agreements relative thereto. It was only by reason of such payment that the purchaser could receive the bundle of rights making up the complete and unconditional title. There was no separate sale of the patent rights as such. We think the transactions fall within the definition of "price" set up in Code (1951), Art. 81, sec. 368 (g). (Cf. Code (1957), Art. 81, sec. 372 (g).) As we see it, the transactions were no different in character from sales of articles whose sales value is enhanced because of the fact that the manufacturer holds patents that give it a virtual monopoly in the field. Under the terms of the judgment, the "consummation and complete performance" of the sale in each case was conditioned upon the payment of a sum that may fairly be described as representing the "aggregate value in money" of the property purchased, without deduction for "cost, or any other expense whatever." We think the release of claims for rentals and royalties was thus an integral part of the price of acquiring title.

Upon the second point raised, however, we think a closer question is presented. No contention is made that the property claimed to be subject to the use tax does not enter into the "processing" of a manufactured product. In the absence

of such a contention, we assume for present purposes that the property meets that test, although there is some authority to the contrary. The machines in question could not have been obtained from any manufacturer except Hartford-Empire, and there is no question here, as there was in *Comptroller of Treasury v. Smith,* 205 Md. 408, 411, as to whether machines of substantially the same kind or utility were "readily obtainable". In that case we stressed the fact that the chief purpose of the use tax was to protect local merchants and the state revenues by removing "the temptation of buyers to place their orders in other States in the effort to escape payment of the tax on local sales." (Citing cases.) That purpose would not be served by construing the statute to cover the purchase of articles that are not obtainable from any other supplier in this or any other state. We noted in *Comptroller of Treas. v. American Can Co.,* 208 Md. 203, 206, that "it is conceded that the parts were not readily obtainable, or obtainable at all, in Maryland, since the Company has exclusive ownership of the special jigs, patterns, dies and designs through which the parts are made, and the various processes and products are protected by patents owned and used exclusively by it."

The appellee attempts to avoid the impact of this reasoning in two ways. He argues that, since the machines were located in Maryland at the time the sales were consummated, the transactions were subject to the sales tax. There is no exemption of property not "readily obtainable" in the Sales Tax Act, corresponding to sec. 370 (f) of the Use Tax Act. We think the short answer to this contention is that if we assume, without deciding, that the transactions were subject to the sales tax, the assessment in question was not imposed upon that theory. The stipulation shows clearly that the deficiency assessment was imposed "for the State of Maryland use taxes, interest and penalty", covering the period in question. We are limited on this appeal to a consideration of the use tax only, and the assessing authority cannot, *nunc pro tunc,* make a new assessment of which the taxpayer had no due notice. The two taxes, although complementary, are "different in conception" and are assessed "upon different transactions". *McLeod v. Dilworth Co.,* 322 U. S. 327, 330.

Moreover, the point was not mentioned in the opinion of the court below, or in the opinion of the comptroller, except that the latter remarked that "since the property did not cross state lines, it might well be said that the sales tax applies rather than the use tax."

The appellee contends, however, that since the machines had a situs here at the time of the sales, they were "readily obtainable in Maryland". We think the mere physical presence of the machinery in Maryland is not controlling. Such a construction is not consistent with the comptroller's Rule 62, which reads:

"For the purposes of this rule, the phrase 'not readily obtainable in Maryland' shall mean any property which meets both of the following tests: (1) Property that cannot be purchased from the stock of a retailer located in this State; (2) Property that cannot be ordered by one of the following persons located in Maryland: a retailer, distributor or agent of an out of state manufacturer or producer who in the regular course of business customarily takes orders for such property for delivery in Maryland in the quantity ordered by the purchaser." We think the machines in question, already installed and in operation at the time of sale, and depreciated in some cases to zero, cannot properly be described as the "stock of a retailer, located in this state". Hartford-Empire was not "located in this state". Even if the phrase "located in this state" refers to the "stock" and not the "retailer", the word "stock" in this connection seems to have reference to goods held for display and sale to the general public in the regular course of business. Cf. *Peoples' Gas & Electric Co. v. State Tax Commission,* 28 N. W. 2d 799 (Iowa). It has been held that the words "stock in trade" do not include articles ordered for a particular customer to which the supplier retains title, and which are to be returned to the supplier unless the sale is consummated. *District of Columbia v. King,* 243 F. 2d 248, 250. Each machine in the instant case was under lease to the appellant and the appellant alone had the option in each case to purchase it, or to retain it subject to the lease. Clearly this machinery could not be ordered by any other person "in the quantity ordered

248

by the purchaser," as spelled out in the second part of the rule, and the appellant was not a retailer, distributor or agent of Hartford-Empire, regularly taking orders for such property.

For the reasons stated, we think the property in question was not readily obtainable in Maryland under the facts stipulated, and that the appellant is entitled to a refund of the use taxes paid.

*Judgment reversed and case remanded, costs to be paid by the appellee.*