884 A.2d 112

**COMPTROLLER OF THE TREASURY**

v.

**CITICORP INTERNATIONAL COMMUNICATIONS, INC.**

No. 147, Sept. Term, 2004.

Court of Appeals of Maryland.

Oct. 4, 2005.

Leslie Moore Romine, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellant.

Michael A. Pearl (Morrison & Foerster LLP, New York City, Stuart Levine, Fisher & Winner, LLP, Baltimore, on brief), for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

This case involves the termination of a lease for computer equipment. We are asked to decide whether a fee paid by the lessee to terminate the lease is taxable. Two preliminary questions reside within this question: (1) whether the payment was made pursuant to a transaction that can be defined as a "sale," within the meaning of the relevant Tax General Article sections, and (2) if the payment was made pursuant to a "sale," whether the amount paid constituted part of the "taxable price" of the lease transaction. We hold that the fee paid to terminate the lease was not a "sale" and, therefore, is not subject to sales tax.

## FACTS

On May 30, 1990, Citicorp International Communications, Inc. ("CICI") entered into a lease agreement ("Master Lease") with IBM Credit ("IBM") for computer equipment that CICI used in its data center in Silver Spring, MD. In January 1997,

the parties extended the lease for an additional term. On September 3, 1998, CICI decided to upgrade its computer equipment and sought a release from the obligations of its lease with IBM.

On October 20, 1998, CICI and IBM negotiated a termination agreement ("Termination Agreement") which released CICI from its Master Lease obligations, as of November 1, 1998. Pursuant to the Termination Agreement, CICI returned the old computer equipment to IBM and paid a termination fee of $7,219,998. In addition, CICI purchased replacement equipment from IBM at a cost of $7,387,800, plus sales tax of $369,390.

Initially, CICI did not pay sales tax on the lease termination fee. On December 1, 1998, IBM submitted another invoice to CICI for sales tax on the termination fee, in the amount of $360,999.90. On April 1, 1999, CICI paid the sales tax, even though it doubted its obligation to pay the tax. On April 24, 2000, CICI made an anonymous request, through Christine M. Oates, a Manager at the accounting firm of KPMG, LLP, to the Maryland Comptroller of the Treasury for a ruling on the taxability of the termination fee. James Dawson, the Assistant Legal Director of the Office of the Comptroller, responded to the request by letter, dated June 8, 2000. Dawson "declined to issue a formal declaratory ruling" but did agree to answer the question informally. Dawson framed the question before him as "whether the Maryland sales and use tax applies to termination payments made for the early termination of a lease of tangible personal property when the property subject to the lease is required to be returned to the lessor and title to the tangible personal property does not pass to the lessee." Noting that the statutes and regulations do not address termination fees, Dawson concluded that,

> [t]he termination fee ... is a charge imposed by the lessor on the lessee to terminate the lease agreement and relieve each of the parties from the requirements of the lease agreement. The property subject to the lease agreement is to be returned to the lessor by the lessee and title to the property will not in any way vest to the lessee. The

termination agreement as described in your request is an agreement separate and apart from the lease agreement and does not appear to be a condition or requirement of the lease agreement. Therefore, the termination fee cannot be deemed consideration in the "consummation and complete performance of a sale" as provided in § 11–101(j). The termination fee would not be considered part of the "taxable price" and thus, would not be subject to the Maryland sales and use tax.

On September 5, 2000, CICI filed a Sales and Use Tax Refund Application with the Comptroller seeking a refund of the sales tax paid on the termination fee. The Comptroller's Refund Supervisor requested that CICI file additional documents with its application, and on January 29, 2001, CICI refiled its Refund Application along with those documents. By letter dated July 30, 2001, the Refund Supervisor denied CICI's request. On September 28, 2001, the Comptroller held an informal hearing on the matter. On January 4, 2002, the Comptroller issued a Notice of Final Determination, denying the refund.

CICI appealed to the Maryland Tax Court and on November 6, 2002, the court heard oral arguments on the matter. The parties stipulated to the relevant facts and presented argument to the court. On February 23, 2004, the Tax Court reversed the Comptroller. The Tax Court found that, under the lease termination agreement, CICI "released its interest in the leased equipment and was relieved of all obligations with respect to such property after November 1, 1998." The court concluded that "the clear and unambiguous provisions of the Master Lease and the Lease Termination Agreement and the lack of any transfer of title of the leased property to the Petitioner establish that the lease termination payment was not made pursuant to a transaction that is a 'sale' as defined by § 11–101(g)."

The Comptroller appealed to the Circuit Court for Baltimore City. That court held a hearing on the matter and on August 24, 2004, affirmed the Tax Court's decision. The

Comptroller filed a Motion for Reconsideration that was later denied by the Circuit Court. Subsequently, the Comptroller noted a timely appeal. While the case was pending in the Court of Special Appeals, but before a decision there, we granted *certiorari* on our own initiative. *Comptroller v. Citicorp,* 385 Md. 511, 869 A.2d 864 (2005).

## STANDARD OF REVIEW

As stated in *CBS v. Comptroller,* 319 Md. 687, 697–98, 575 A.2d 324, 329 (1990), "[a] reviewing court must affirm [the decision of] the Tax Court if its order 'is not erroneous as a matter of law,' and if the order 'is supported by substantial evidence appearing in the record' " (quoting *Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 834, 490 A.2d 1296, 1300–01 (1985)). We explained in *Ramsay, Scarlett & Co.* that, "the Tax Court's decision is based on a factual determination, and there is no error of law, the reviewing court may not reverse the Tax Court's order if substantial evidence of record supports the agency's decision." *Ramsay, Scarlett & Co.,* 302 Md. at 834, 490 A.2d at 1301 (internal citations omitted).

We are not at liberty to substitute our judgment for the expertise of the agency. Our role is to accord deference to an agency's interpretation of a statute which it administers. *Charles County Department of Social Services v. Vann,* 382 Md. 286, 295–96, 855 A.2d 313, 319 (2004)(stating that a court gives deference to an agency's legal interpretation of its own statute or regulations); *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 69, 729 A.2d 376 (1999)(noting that, "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.") (citations omitted).

Furthermore, recognizing that the agency's decision is "prima facie correct and presumed valid," "we must review the agency's decision in the light most favorable to it." *Ramsay, Scarlett & Co.,* 302 Md. at 835, 490 A.2d at 1301. We also note that "it is the agency's province to resolve conflicting

evidence and where inconsistent inferences can be drawn from the same evidence it is for the agency to draw the inferences." *Id.*

■ Finally, we note that the interpretation of the tax law can be a mixed question of fact and law, the resolution of which requires agency expertise. *NCR Corp. v. Comptroller,* 313 Md. 118, 133–134, 544 A.2d 764, 771 (1988) (stating that "determinations involving mixed questions of fact and law must be affirmed if, after deferring to the Tax Court's expertise and to the presumption that the decision is correct, a reasoning mind could have reached the Tax Court's conclusion.")(internal quotation marks omitted). *See also Vann,* 382 Md. at 298, 855 A.2d at 320 (stating that "[d]eferential review over mixed questions of law and fact is appropriate in order for the agency to fulfill its mandate and exercise its expertise"); *CBS,* 319 Md. at 698, 575 A.2d at 329 (noting that, "we apply [a] deferential standard of review not only to its factfinding and its drawing of inferences, but also to its 'application of the law to the facts' "); *Ramsay, Scarlett & Co.,* 302 Md. at 838, 490 A.2d at 1303 (holding that "whether a business is unitary or separate ... for tax purposes ... is not solely a question of law" and therefore, the Tax Court's decision on the question deserves deference. Rather, we must ask "whether in light of substantial evidence appearing in the record, a reasoning mind could reasonably have reached the conclusion reached by the Tax Court, consistent with a proper application [of the tax statute in question].").

Unless the Tax Court's decision was erroneous as a matter of law, or its conclusion was not supported by substantial evidence, we must affirm that decision. *See CBS,* 319 Md. at 697–98, 575 A.2d at 329 (internal quotations and citations omitted).

■ In the instant case, the issue of whether the termination fee is part of the "taxable price" of the Master Lease is a question of law that hinges on two factual issues: (1) was the termination fee part of a sale, and (2) was the Lease Termination Agreement part of the Master Lease. Therefore,

whether the termination fee is subject to sales tax is a mixed question of law and fact and compels a certain deference to the Tax Court's decision.

## DISCUSSION

The resolution of the question in this case depends on the interpretation and application of sections of the Tax General Article and related provisions of COMAR. We begin, therefore, with a review of the rules of statutory interpretation. Our goal is to " 'ascertain and effectuate the intention of the legislature,' " and we begin that exercise by reviewing the statutory language itself. *Rockwood Casualty Insurance Co. v. Uninsured Employers' Fund,* 385 Md. 99, 108, 867 A.2d 1026, 1031 (2005) (quoting *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995)). As explained in *Oaks,* " 'if the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written.' " *Oaks,* 339 Md. at 35, 660 A.2d at 429 (quoting *Jones v. State,* 336 Md. 255, 261, 647 A.2d 1204, 1206–07 (1994)). Furthermore, we note that we will not read COMAR provisions in isolation. Rather, "we must interpret [them] in light of [their] enabling legislation. . . ." *Worton Creek Marina v. Claggett,* 381 Md. 499, 511, 850 A.2d 1169, 1176 (2004). Finally, we note that " 'when specifically interpreting tax statutes, this Court recognizes that any ambiguity within the statutory language must be interpreted in favor of the taxpayer.' " *Supervisor of Assessments of Anne Arundel County v. Hartge Yacht yard, Inc.,* 379 Md. 452, 461, 842 A.2d 732, 737 (2004) (quoting *Comptroller v. Clyde's of Chevy Chase, Inc.,* 377 Md. 471, 484, 833 A.2d 1014, 1021 (2003)).

Section 11–102 of the Tax General Article provides that a sales and use tax is imposed on "(1) a retail sale in the State; and (2) a use, in the State, of tangible personal property or a taxable service." Md.Code (1988, 2004 Repl.Vol.), § 11–102(a) of the Tax General Article. In addition, § 11–103 provides that there is a rebuttable presumption "that any sale in the State is subject to the sales and use tax imposed under § 11–102(a)(1) . . ." and that "[t]he person required to pay the sales

and use tax has the burden of proving that a sale in the State is not subject to the sales and use tax." Md.Code (1988, 2004 Repl.Vol.), § 11–103 of the Tax General Article.

Section 11–101 (i) of the Tax General Article defines "sale" as

> (i) title or possession of property is transferred or is to be transferred absolutely or conditionally by any means, including by lease, rental, royalty agreement, or grant of a license for use; or
>
> (ii) a person performs a service for another person.

Md.Code (1988, 2004 Repl.Vol.), § 11–101(i) of the Tax General Article.[1] In further explanation of the definition of a "sale," Section 03.06.01.28 of COMAR provides:

> A. The transfer of possession, absolutely or conditionally by any means, of tangible personal property for a consideration, by way of lease, rental, royalty agreement or grant of a license for use, referred to in this regulation as a "lease," is included within the statutory definition of the term "sale" and is thus subject to the tax in the absence of a specific exemption or exclusion.
>
> B. Each lease payment period is considered a separate lease, and thus a separate sale, for the purpose of determining when the tax is to be collected or paid.

Section 11–101(*l*) of the Tax General Article defines "taxable price" as "the value, in money, of the consideration of any kind that is paid, delivered, payable, or deliverable by a buyer to a vendor *in the consummation and complete performance of a sale* without deduction for any expense or cost. . . ." Md.Code (1988, 2004 Repl.Vol.), § 11–101(*l*) of the Tax General Article (emphasis added).

As made clear by § 11–102, the imposition of sales tax requires, in the first instance, a sale. Md.Code (1988, 2004

---

1. We note that Title 11 of the Tax General Article does not define the term "lease." Section 2A–103(j) of the Commercial Law Article, however, defines the term as "a transfer of the right to possession and use of goods for a term in return for consideration. . . ." Md.Code (1975, 2002 Repl.Vol., 2004 Supp.), § 2A–103(j) of the Commercial Law Article.

Repl.Vol.), § 11–102 of the Tax General Article. In keeping with that concept, the statutory definition of "taxable price" includes consideration paid "in the consummation and complete performance *of a sale.*" Md.Code (1988, 2004 Repl.Vol.), § 11–101($l$) of the Tax General Article. (Emphasis added.) Moreover, under § 11–103, the presumption that sales tax is owed and the burden of proof on the taxpayer, only exist if the transaction in question actually is a sale. Md.Code (1988, 2004 Repl.Vol.), § 11–103 of the Tax General Article. Considering the plain language of the statutory and regulatory provisions in question, it is clear that if the transaction at issue in this case is not a "sale," the consideration paid for the transaction, by definition, cannot be part of the "taxable price," and cannot be subject to sales and use tax.

Section 6.1 of the Master Lease between CICI and IBM provides that payment is "absolute and unconditional and shall not be subject to any abatement, reduction, set off, defense, counterclaim, interruption, deferment or recoupment for any reason whatsoever, and that such payments shall be and continue to be payable in all events." The Comptroller argues that, under this language, "there is no way out of the Lease, short of complete and total payment of all rental payments due at the inception of the Lease." As a result, the Comptroller asserts that the Termination Agreement entered into by CICI and IBM was not a separate agreement at all, but merely an amendment to the existing lease.[2] The Comptroller argues that because CICI paid the Termination fee "to meet

---

2. As additional support for his argument that the termination agreement was not separate from the Master Lease, the Comptroller points to the fact that the Termination Agreement was labeled with the same identification number as the "term lease supplements," documents that all parties agree are part of the Master Lease. We are not persuaded by that argument, as it appears to us to elevate form over substance. The Comptroller's contention that paragraphs (b) and (d) of the Master Lease render the Termination Agreement a "Term Lease Supplement" is similarly unconvincing.

We interpret the Termination Agreement and Master Lease based on a review of the *contents* of those documents, not on the basis of the

and complete its pre-existing obligations under the Lease, payment of this fee constitutes 'consummation and complete performance of a sale,' and is therefore a payment of 'taxable price' subject to sales tax."

There are two flaws in the Comptroller's argument. First, the argument ignores language in the Master Lease that provides an exception to the seemingly "absolute and unconditional" language of Section 6.1. Second, the argument mischaracterizes the nature of the termination transaction between IBM and CICI.

Section 14.1 of the Master Lease, provides that "[n]either this Master Lease nor any Equipment Schedule may be altered, modified, terminated or discharged *except by a writing signed by the party against whom such alteration, modification, termination or discharge is sought.*" [3] (Emphasis added.) We agree with the Tax Court's finding that the written Termination Agreement entered into by CICI and IBM released CICI from its obligations under the lease.[4] The Termination Agreement states, in relevant part,

---

numbers used to identify those documents. A termination agreement entered into for the purpose of terminating a particular lease is undoubtedly "part of" the lease, insofar as it is *connected to and related to* the lease that is being terminated—it would be difficult to imagine how companies as large as IBM and CICI, who likely have many leases with multiple parties, would know which lease was being terminated without a reference to the lease itself. That fact, however, does not transform a lease termination fee into a rental payment, as argued by the Comptroller. As previously explained, the contents of the Termination Agreement itself make it clear that it was not a part of the Master Lease. Rather, it was a separate agreement through which CICI and IBM terminated the Master Lease and released each other from further performance in accordance with its terms.

3. We note that the Commercial Law Article recognizes the concept that parties may enter into seemingly "absolute and unconditional" agreements that can be modified by agreement in writing. *See* Md.Code (1975) (2002 Repl.Vol.) § 2A–208 (2) of the Commercial Law Article (providing, in pertinent part, that "[a] signed lease agreement that excludes modification or rescission except by a signed writing may not be otherwise modified or rescinded . . .").

4. The court concluded "that the Termination Agreement is a separate and distinct agreement from, and not an amendment to, the Master

Lessee *releases all of its interest in the leased equipment* indicated above ("Leased Items") and Lessor agrees to *discontinue such leases and to relieve Lessee from all continuing obligations to pay Rent* due after the Termination/Prepayment Date indicated above.... In consideration for Lessor's agreement to release Lessee from its original lease/financing obligations after the Termination/Prepayment date, Lessee shall pay Lessor the Total Charge indicated above.

(Emphasis added.)

■■■ The transaction between CICI and IBM, whereby IBM released CICI from its obligations under the lease and CICI paid the termination fee and returned the old equipment, does not fit within the statutory or regulatory definition of the word "sale." Upon termination of the agreement and payment of the termination fee to IBM, there was no transfer of title or possession of property to the lessee, as contemplated by § 11–101(g) of the Tax General Article and Section 03.06.01.28 of COMAR. In fact, in the instant case, CICI, the party paying the fee, transferred the property back to IBM, the party receiving the fee. Such an arrangement cannot fairly be described as a "sale," as that term is generally defined or as it is defined in the relevant statutes and regulations. To consider this arrangement a "sale" would turn the statutory definition of that term on its head. We seek to avoid statutory constructions "that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106, 112 (1994).

We do not think the statutory definition of "sale" is ambiguous. Even if it were, we would not be inclined to interpret the statute as suggested by the Comptroller, in view of the

Lease," and also that "[t]he termination charge imposed by IBM Credit on Petitioner relieved each of the parties from the requirements of the lease agreement. Rather than being a condition or requirement added to the Master Lease, the Termination agreement effectively rendered the Master Lease void."

standard described in *Comptroller v. Gannett*, 356 Md. 699, 707–08, 741 A.2d 1130, 1135 (1999), in which we said:

> "When ... the applicability of a tax statute and not a tax exemption is being construed, it is the established rule not to extend the tax statute's provisions by implication, beyond the clear import of the language used, to cases not plainly within the statute's language, and not to enlarge the statute's operation so as to embrace matters not specifically pointed out. In case of doubt, tax statutes are construed 'most strongly against the government, and in favor of the citizen.'"

(quoting *Comptroller v. John C. Louis Co.*, 285 Md. 527, 539, 404 A.2d 1045, 1053 (1979) (internal citations omitted)).

The Comptroller also argues that the Termination Fee is taxable because, even though IBM and CICI call it a termination fee, it should be viewed as a consolidation of the payments CICI would have paid under the Master Lease had the lease continued through the end of the term, discounted to present value.[5] In other words, instead of making several payments over the course of the Master Lease (for the use of the equipment), the Comptroller argues that CICI made one lump sum payment to fulfill its lease obligations. That argument ignores the fact that the termination fee was not actually paid to fulfill CICI's lease obligations, which consisted of the requirement to pay for the use of the equipment. Rather, as stated in the Termination Agreement itself, CICI paid the fee *to cancel* the lease and to be released from "all continuing obligations to pay Rent" under the Master Lease.

We will not look behind the words of the agreement between IBM and CICI in an attempt to ferret out an intention not otherwise described by the language of the agreement itself. To do so would violate the rules of the interpretation of contracts. As recently noted in *Owens–*

---

5. In view of the fact that the termination fee amount is similar to the amount that would have been paid had the lease continued, the Comptroller asserts that the termination fee is just a creative label for what is really a buyout of the Master Lease.

*Illinois v. Cook,* 386 Md. 468, 872 A.2d 969 (2005), when construing a contract, we

> "must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed."

*Owens–Illinois v. Cook,* 386 Md. at 496–97, 872 A.2d at 985 (quoting *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

Moreover, this transaction cannot be viewed as a buyout of a lease because CICI returned the leased equipment to IBM upon signing the Termination Agreement and paying the termination fee. The party that received the money also retained the goods. Consideration, within the context of the statutory definitions of "sale" and "taxable price," involves an exchange. Md.Code (1988, 2004 Repl.Vol.), §§ 11–101(i), (*l*) of the Tax General Article. As previously noted, a "sale" occurs when "title or possession of property is transferred . . . absolutely or conditionally . . . including by lease." Md.Code (1988, 2004 Repl.Vol.), §§ 11–101(i) of the Tax General Article. Furthermore, Section 03.06.01.28 of COMAR further defines "sale" as "[t]he transfer of possession . . . of tangible personal property for a consideration. . . ." Ordinarily, the buying party makes payment in exchange for the receipt of goods from the selling party.

Under the Master Lease in the present case, CICI's money was exchanged for the possession and use of computer equipment. Under the Lease Termination Agreement, CICI's money was exchanged not for possession and use of computer equipment but for a release from the Master Lease obligations. The term "release" is defined as "[l]iberation from an obligation, duty, or demand; the act of giving up a right or claim to the person against whom it could have been enforced." Black's Law Dictionary 1292 (7th ed.1999). As a

practical matter, CICI paid an agreed-upon fee to avoid being sued for breach of lease.[6] If we view the transaction as requested by the Comptroller, there is no exchange. Under the Comptroller's view, CICI would have paid "rent" for the remaining term of the lease and in return would get nothing— except the prior possession and use of the equipment that CICI had *already* enjoyed and for which it had *already* paid rent and taxes. Had the Master Lease actually remained in effect, the rent would have continued to be paid monthly and CICI would have continued to enjoy monthly possession and use of the computer equipment, in exchange for each payment. There is no comparable exchange of payment for possession and use of equipment, if the fee is paid all at once and the equipment is returned before the expiration of the lease term.[7]

---

**6.** The fact that the amount paid was the same amount of the remaining lease payments, discounted to present value, does not change the analysis. Apparently, IBM had the bargaining power to demand a high price in order to release CICI from it's lease obligations and CICI was willing to pay that price, rather than risk being sued. As a general rule, participants in a free market place are free to contract as they wish. *Nesbit v. GEICO*, 382 Md. 65, 76, 854 A.2d 879, 885 (2004). Absent fraud, duress, or mistake, or a conflict with public policy, we will interpret a contract as it is written. *See Owens–Illinois v. Cook*, 386 Md. at 496–97, 872 A.2d at 985 (noting that " 'in the absence of fraud, duress, or mistake, parol evidence is not admissible to show the intention of the parties or to vary, alter, or contradict the terms of that contract' " quoting *General Motors Acceptance Corp. v. Daniels*, 303 Md. at 261, 492 A.2d at 1310); *Finch v. Holladay–Tyler Printing, Inc.*, 322 Md. 197, 206, 586 A.2d 1275, 1280 (1991) (noting that a contractual provision that violates public policy is invalid).

**7.** The Comptroller argues in its brief that,

> [t]he fact that Citicorp shortened the period of possession of the equipment by executing the Termination does not support the conclusion it was the Termination that caused Citicorp to be required to return the equipment. The equipment had to be returned at the conclusion of the Lease in any event. The Termination merely moved the date on which surrender of the equipment had to occur.

That argument transforms the payment of the termination fee into a lump sum payment of rent. Such a transformation contradicts the language of the Termination Agreement itself, which states that CICI must release its interest in the equipment and pay a termination fee and, in exchange, IBM will "relieve [CICI] from all continuing obligations to pay *Rent* . . ." (Emphasis added.)

■ The Tax Court made a finding that the termination fee "relieved each of the parties from the requirements of the lease agreement." The only thing exchanged for the termination fee in this case, and therefore the only thing for which it can be said to be consideration, is the release from the Master Lease obligations. In our view, payment in exchange for the termination of a lease is not part of the "taxable price" of a transaction because it is not among the transactions that fairly fit within the statutory definition of a "sale." As a result, the Comptroller has no statutory authority to impose a sales tax on such a transaction.

We have found no Maryland case discussing the question of whether a lease termination fee, paid in connection with the return of the leased property, is subject to a sales and use tax. The Comptroller relies on *Chesapeake Industrial Leasing Company, Inc. v. Comptroller,* 331 Md. 428, 628 A.2d 234 (1993), in support of its argument. The Comptroller's reliance on *Chesapeake* is misplaced. Our discussion in *Chesapeake* of "lease payment periods" (the part of the opinion upon which the Comptroller relies), actually provides support to CICI's position. We said:

> In particular, the parties differ on the meaning of section 03.06.01.73.B, which identifies each "lease payment period" as a separate sale and, therefore, as the trigger for collection and remission of tax under the Statute.
>
> Chesapeake's first argument is that if the lessees ceased paying rent, the leases ended, meaning there were no more "lease payment periods" and consequently no more "sales" to which the sales tax could apply as per COMAR 03.06.01.73.B. We need not address today the effect of lease termination upon a vendor's obligation to remit sales tax because there is no evidence that the leases in this case actually terminated. Chesapeake's lessees apparently remained in possession of the leased property, and so we presume the periodic payments remained due and the leases continued to exist. There is no indication that the leases were ever terminated or, alternatively, that they contained

an automatic termination clause effective upon a lessee's failure to pay.

*Chesapeake,* 331 Md. at 439, 628 A.2d at 239.

By contrast, in the instant case, it is clear that the lease terminated, that the lessee no longer was obligated to pay rent, and that the lessee returned the property to the lessor. As already noted, the Tax Court found that the Termination Agreement between IBM and CICI was not a part of the lease but that it "effectively rendered the Master Lease void." The discussion in *Chesapeake* does not in any way lead to the conclusion that a payment made to terminate a lease (in conjunction with the lessee's return of the leased equipment to the lessor), is subject to sales and use tax.[8]

CICI relies on *Maryland Glass Corporation v. Comptroller,* 217 Md. 241, 142 A.2d 570 (1958). In *Maryland Glass Corporation,* Maryland Glass purchased manufacturing machinery from a company known as Hartford–Empire. *Maryland Glass,* 217 Md. at 243, 142 A.2d at 571. At the time of the purchase, the machinery was installed and used by Maryland Glass because Maryland Glass had been leasing the machinery from Hartford–Empire. *Id.*[9] In addition to the purchase price

---

8. We concluded the discussion of "lease payment periods" in *Chesapeake* by rejecting Chesapeake's argument "that the 'lease payment periods' marking the taxable 'sale' ceased just because the lessees stopped making payments." *Chesapeake,* 331 Md. at 439–40, 628 A.2d at 239. We held that "the words 'lease payment period' ... unambiguously describe the period during which each payment is due, not the actual payment itself." *Chesapeake,* 331 Md. at 440–41, 628 A.2d at 240. In order for our discussion in *Chesapeake* to support the Comptroller's argument at all, we would have to characterize the termination fee paid by CICI as the last lease payment of the lease, instead of as a fee paid to terminate the obligations of the lease. The plain language of the Termination Agreement itself prevents us from doing that. In addition, in order to characterize the termination fee as a lease payment, we would have to consider the Termination Agreement between CICI and IBM as a "sale." As we have already explained, we are prevented from characterizing the termination fee as the last lease payment.

9. Prior to the purchase, Maryland Glass was not permitted to buy the machinery because Hartford–Empire was the exclusive owner of pat-

of $39,974.13, Maryland Glass also paid Hartford–Empire $175,500 "in consideration of the cancellation and termination of outstanding leasing and licensing agreements covering the machinery and related patents. . . ." *Maryland Glass*, 217 Md. at 243, 142 A.2d at 571.

Maryland Glass attempted to obtain a refund of the use tax it paid "upon the use of the property acquired by reason of said payments. . . ." *Maryland Glass*, 217 Md. at 243, 142 A.2d at 572. Maryland Glass argued, among other things, that the transaction was not subject to use tax because the payment to terminate and cancel the leasing and licensing agreements did not constitute "use . . . of tangible personal property purchased from a vendor within or without this State," under the applicable tax statute. *Id.* In answer to that contention, we held:

> The property transferred in the instant case was tangible personal property, and the price paid for each transfer included not only the depreciated book value but an additional sum representing the value to the vendor of the cancellation of the outstanding agreements relative thereto. It was only by reason of such payment that the purchaser could receive the bundle of rights making up the complete and unconditional title. There was no separate sale of the patent rights as such. We think the transactions fall within the definition of "price" set up in Code (1951), Art. 81, § 368(g). Cf.Code (1957), Art. 81, § 372(g). As we see it, the transactions were no different in character from sales of articles whose sales value is enhanced because of the fact

---

ents covering the machinery and Hartford–Empire only leased the machinery to customers. *Maryland Glass*, 217 Md. at 244, 142 A.2d at 572. As a result of an antitrust suit filed against Hartford–Empire, Hartford–Empire

> was directed to offer for sale at any time to any lessee any of its machines then under lease, at a price representing the depreciated book value of each machine, as shown on the books of Hartford–Empire, provided the existing leasing and licensing agreements relative thereto were cancelled, and payment for the cancellation made. . . .

*Maryland Glass*, 217 Md. at 244, 142 A.2d at 572.

> that the manufacturer holds patents that give it a virtual monopoly in the field. *Under the terms of the judgment, the "consummation and complete performance" of the sale in each case was conditioned upon the payment of a sum that may fairly be described as representing the "aggregate value in money" of the property purchased, without deduction for "cost, or any other expense whatever." We think the release of claims for rentals and royalties was thus an integral part of the price of acquiring title.*

*Maryland Glass,* 217 Md. at 245, 142 A.2d at 573 (emphasis added). In other words, in *Maryland Glass,* the purchaser of the property had to pay a purchase price *and* a lease termination fee, *in exchange for title to the property.* By stark contrast, in the instant case, the lease termination fee was not paid in exchange for acquiring title or possession of the leased property, *because the property was returned to the lessor.* As a result, the termination fee was not paid in the consummation and complete performance of a "sale."

In view of the fact that no Maryland case illumines the issue before us, both parties have urged us to rely on cases from other jurisdictions. CICI relies on *Grabler Manufacturing Company v. Kosydar, Tax Commr.,* 35 Ohio St.2d 23, 298 N.E.2d 590 (1973). In *Grabler,* the lease between the parties included a provision for "premature termination" of the lease that permitted the lessor to terminate the lease and demand a return of the equipment or enter the lessee's property to take possession of the equipment, if the lessee defaulted in the payment of rent. *Grabler,* 298 N.E.2d at 593. The "premature termination" provision of the lease also provided for the payment of liquidated damages owed to the lessor in the event of such a breach by the lessee. *Id.* The Board of Tax Appeals held that the payments made as liquidated damages were taxable because the amount paid was "contracted for within the term of 'price'" as defined under the applicable tax statute. *Grabler,* 298 N.E.2d at 594.

Similar to Maryland's definition of "taxable price," the Ohio statute at the time defined "price" as "the aggregate value in money of anything paid or delivered, or promised to be paid or

delivered, in the complete performance of a retail sale...."
*Grabler*, 298 N.E.2d at 594. Also similar to Maryland's defini-
tion of "sale," the Ohio statute defined "sale" and "selling" to
"include all transactions by which title or possession, or both,
of tangible personal property, is or is to be transferred...."
*Id.* Having reviewed those statutory provisions, the Supreme
Court of Ohio reversed the Board of Tax Appeals and held
that,

> [t]he monies paid by Grabler as a deficiency, even though
> paid in accord with the terms of a lease contract, cannot be
> included within the definition of "price" in R.C. Chapter
> 5739, and hence are not taxable. Further, the monies paid
> were specifically labeled in the lease contracts as "liquidated
> damages."
>
> Black's Law Dictionary (4 Ed.) defines "rent" as "consider-
> ation paid for use or occupation of property."
>
> The essence of this definition is an *exchange* of some
> consideration paid for the use of something. In the instant
> case, the monthly rental installments were paid by Grabler
> to Commercial Credit Corporation as the consideration for
> use of the equipment. The monies paid as a deficiency by
> Grabler were not paid for the use of something; nor were
> they paid in exchange for anything.

*Grabler*, 298 N.E.2d at 594.

While *Grabler* is factually distinguishable from the case at
bar, we think its reasoning is instructive. The liquidated
damages in *Grabler* were not paid in exchange for the posses-
sion and use of the equipment, and therefore, could not be
included within the statutory definition of the term "sale."
Likewise, in the instant case, the termination fee was not paid
in exchange for the possession and use of the equipment, and
therefore, for reasons already explained, cannot be included
within the statutory definition of "sale." [10]

---

10. CICI notes in its brief that after *Grabler* was decided, the Ohio
Legislature amended the definition of the term "price" contained in
Ohio Rev.Code Ann. § 5739.01(H) to include a "termination or damage
charge." While CICI's citation contained no reference date, it appears

The Comptroller relies on *Residential Information Services Limited Partnership v. Rylander*, 988 S.W.2d 467 (Tex.App. 1999). In *Rylander*, the Court of Appeals of Texas considered whether payment to terminate a computer equipment lease was subject to sales tax. The court affirmed the trial court's judgment in favor of the Comptroller, holding that the termination payment was taxable because it was a part of the entire lease price. *Rylander*, 988 S.W.2d at 471. In reaching this conclusion, the court noted that

> Comptroller Rule 3.294(d) specifically indicates that all charges related to a lease agreement are taxable, including "a charge imposed for the early termination of the lease." 34 Tex. Admn.Code § 3.294(d) (1988). Additionally, Comptroller Rule 3.294(d)(5) makes clear that "a charge imposed for the early termination of the lease is included in the lease price and is taxable." *Id.* § 3.294(d)(5).

*Rylander*, 988 S.W.2d at 470. By contrast, Maryland has no similar regulation, equating a lease termination fee with the lease price or explicitly permitting the imposition of a tax on the payment of a lease termination fee. As a result, even though the facts of the instant case are very similar to the facts of *Rylander*, the Comptroller's reliance on that case is misplaced.

 The Comptroller argues that even though Maryland has no similar rule, we should follow the conclusion in *Rylander* because the court in that case found that the Texas Comptroller's rule was a "proper interpretation" of the "economic realities of the marketplace." *Rylander*, 988 S.W.2d at 470. Specifically, the court stated that,

---

that the current incarnation of 5739.01(H) does not include a "termination or damage charge" in its definition of "price." A reference to the inclusion of a "termination or damage charge" in connection with the definition of "price" can be found in an Amendment Note to § 5741.01, a section that contains the definitions used in the chapter of the Ohio Code addressing use and storage taxes. The note indicates that the definition of "price" in subsection (G)(1) was rewritten to exclude the term "termination or damage charge" by H.B. 95, 125th Gen. Assem., Reg. Sess. (Ohio 2003). Maryland's legislature has taken no similar action.

> [g]iven the economic realities of the marketplace, we believe that the Comptroller correctly views the termination payment as being an integral part of the lease agreement rather than a penalty for forgiveness of future obligations.
>
> * * *
>
> The amount of the termination payment was not a punishment for early termination *per se*, it merely reflected the increased cost of the lease had it been negotiated for a shorter term.

*Rylander,* 988 S.W.2d at 470. For us to follow that reasoning, we would have to ignore the words of the Termination Agreement itself, in an effort to characterize the transaction between IBM and CICI as a sale instead of a termination of a lease. As previously stated, we are not permitted to do that. *Owens–Illinois v. Cook,* 386 Md. at 496–97, 872 A.2d at 985. Moreover, as already discussed, the relevant Maryland statutory provisions do not lend themselves to the conclusion that a payment made to terminate a lease is subject to sales tax. The reasoning in *Rylander* does not change our interpretation of the plain language of those provisions. It would be fundamentally unfair to permit the Comptroller to impose a sales tax on a transaction, without notice to the taxpayer that the law permits such a tax. Again, as already noted:

> [W]hen ... the applicability of a tax statute ... is being construed, it is the established rule *not to extend the tax statute's provisions by implication, beyond the clear import of the language used,* to cases not plainly within the statute's language, and not to enlarge the statute's operation so as to embrace matters not specifically pointed out.

*Comptroller v. Gannett,* 356 Md. 699, 707–08, 741 A.2d 1130, 1135 (1999) (emphasis added) (quoting *Comptroller v. John C. Louis Co.,* 285 Md. 527, 539, 404 A.2d 1045, 1053 (1979) (internal citations omitted)). Neither the Comptroller nor this Court is permitted to extend the tax statute's reach. Only the legislature has the power to do that. *See Stearman v. State Farm,* 381 Md. 436, 454, 849 A.2d 539, 550 (stating that "[w]e will not invade the province of the General Assembly and rewrite the law for them.... The formidable doctrine of

separation of powers demands that the courts remain in the sphere that belongs uniquely to the judiciary—that of interpreting, but not creating, the statutory law.").

We also note, that even if Maryland had a regulation like the regulation in *Rylander*, our review of the relevant statutory provisions would require us to hold that such a regulation was beyond the Comptroller's power to promulgate. As explained in *Lussier v. Maryland Racing Commission*, 343 Md. 681, 686, 684 A.2d 804, 806 (1996), "in determining whether a state administrative agency is authorized to act in a particular manner, the statutes, legislative background and policies pertinent to that agency are controlling." The controlling standard is whether the regulation is " 'consistent with the letter and spirit of the law under which the agency acts.' " *Lussier*, 343 Md. at 687, 684 A.2d at 807. (Internal citations omitted.) Even when the "Legislature has delegated such broad authority to a state administrative agency to promulgate regulations in [a particular] area, the agency's regulations are valid under the statute *if they do not contradict the statutory language or purpose.*" *Lussier*, 343 Md. at 688, 684 A.2d at 807 (1996) (emphasis added).

There is nothing in the statutory definition of the term "sale" that could fairly be said to cover the transaction that occurred in the instant case.[11] As a result, it would not be "consistent with the letter and spirit of the law" to permit the Comptroller to impose a "sales" tax on such a transaction. Unless the legislature changes the statute, the payment of a fee to terminate a lease is not a sale and, therefore, is not subject to Maryland sales and use tax.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE COMPTROLLER.

WILNER, J., Dissents.

---

11. As has been stated already, there was no exchange of goods and money, as contemplated by the statute. Rather, the buyer returned the goods to the seller *and* paid an expensive penalty for the early termination of a lease.

Dissenting Opinion by WILNER, J.

Maryland Code, § 11–102(a) of the Tax–General Article imposes a tax on "a retail sale in the State" and on "a use, in the State, of tangible personal property or a taxable service." Section 11–104(a) bases the tax on the "taxable price" of the property or service. Section 11–103 creates a rebuttable presumption that "any sale in the State is subject to the sales and use tax imposed under § 11–102(a)(1) of this subtitle" and places the burden on the person required to pay the sales or use tax of proving that a sale in the State is not subject to the tax.

Two terms used in §§ 11–102(a) and 11–104(a) are critical in this case—"sale" and "taxable price." Those terms are defined in § 11–101. Section 11–101(i) defines "sale" as including "a transaction for a consideration whereby ... title or possession of property is transferred or is to be transferred absolutely or conditionally by any means, *including by lease* ..." (Emphasis added). Section 11–101(*l*) defines "taxable price," in pertinent part, as "the value, in money, of the consideration of any kind that is paid, delivered, payable, or deliverable by a buyer to a vendor in the consummation and complete performance of a sale without deduction for any expense or cost...."

Sections 2–102 and 2–103 of the Tax–General Article authorize the Comptroller to administer the sales tax law and to adopt reasonable regulations in the administration of that law. Pursuant to that authority, the Comptroller adopted COMAR 03.06.01.28, dealing with the application of the sales tax to leases of tangible personal property. Under that regulation, the transfer of possession of tangible personal property for a consideration by way of lease is included in the statutory definition of "sale," each lease payment is considered a separate lease, and thus a separate sale, and the tax applies "to the entire lease payment if property acquired by lease is within this State at any time during that lease payment period...." With exceptions not relevant here, the tax applies "to the value in money of the consideration *of any kind* required to be

paid to the lessor under the terms of the lease." COMAR 03.06.01.28E. (Emphasis added).

In 1990, Citicorp entered into a Master Lease with IBM Credit Corporation under which Citicorp leased certain computer equipment from IBM. Through an amendment to the Master Lease made in June 1997, the term of the lease was extended to June 27, 2002. Two provisions of the lease, as amended, are of particular relevance. Section 6.1 provided that the lease was a "net lease," that Citicorp's obligation to pay all rent was "absolute and unconditional," and that its obligation was not subject "to any abatement, reduction, set-off, defense, counterclaim, interruption, deferment or recoupment for any reason whatsoever, and that such payments shall be and continue to be payable in all events." Section 14.1, however, permitted the Master Lease to be altered, modified, terminated, or discharged by a writing "signed by the party against whom such alteration, modification, termination or discharge is sought."

The Master Lease was essentially a skeletal lease. *See International Business Machines v. State Bd. of Equalization,* 26 Cal.3d 923, 163 Cal.Rptr. 782, 609 P.2d 1 (1980). It set forth general terms and conditions applicable to all of the equipment to be leased but did not specify the leased equipment or the term of the lease of such equipment or the rent to be paid for that equipment. All of that was to be done through separate equipment schedules entered into from time to time as various items were leased. Those equipment schedules were regarded as separate, independent leases, though subject to the terms and conditions in the Master Lease. Implicitly, they would become amendments to the Master Lease. Section 1 of the Master Lease described the property subject to the lease as "all of the tangible personal property (collectively the 'Equipment' and individually an 'Item') listed on each equipment schedule ('Equipment Schedule') executed, from time to time, pursuant to this Master Lease." Each such schedule was to "constitute a separate, distinct and independent lease and contractual obligation of Lessee." In furtherance of that provision, the Master Lease

provided that the term of each lease of an item was to be as designated on the equipment schedule applying to that item, and, as a result, the lease terms of the various items of equipment subject to the initial Master Lease varied. Under § 2.2(a) of that agreement, the leases for the individual items could be extended, renewed, or terminated as provided in the equipment schedules applicable to those items. The rent for the various leased items was to be as specified in the equipment schedules. *See* § 3 of the Master Lease. By virtue of the 1997 amendment to the Master Lease, the leases for all of the equipment were extended to June 27, 2002.

It is clear that, subject to an alteration, modification, termination, or discharge made pursuant to § 14.1, Citicorp was liable for the entire amount of rent payable under the Master Lease or the various equipment schedules through June 27, 2002. It is also clear that, under the statutory definitions of "sale" and "taxable price" and the implementing COMAR regulation that each equipment schedule, incorporated into the Master Lease, constituted a taxable retail sale and that a sales tax was imposed and collectible on each rental payment made by Citicorp under the Master Lease. Had the lease continued until its termination date, IBM would have been liable for the tax based on the entire amount of rent payable and paid under the lease. Each month, as it received the rent from Citicorp, it would have been required to remit the tax based on that rental payment to the Comptroller, and, in recognition of that obligation, it did, in fact, make those payments. None of that is in dispute.

In October, 1998, IBM and Citicorp decided on a different arrangement—that Citicorp would return the leased equipment, the Master Lease would be terminated, and Citicorp would purchase other equipment from IBM. In order to effect that new arrangement, IBM and Citicorp, acting pursuant to § 14.1 of the lease, terminated the Master Lease effective October 15, 1998. Pursuant to the termination, Citicorp returned the leased equipment. The termination was not cost-free, however. IBM calculated the amount of rent that would have been due for the various categories of leased equipment

had the lease continued to its normal expiration date, discounted that total amount to arrive at the present value of the gross amount, as of October 15, 1998, and required Citicorp to pay that aggregate discounted amount as a "termination fee." As the termination fee—$8,067,183—took the place of the rent that would have remained due under the lease, Citicorp, understandably, was relieved of further liability for that rent.

The Comptroller takes the position that the lease, incorporating the equipment schedules, constituted a "sale," and that the termination fee, being part of the consideration paid by Citicorp under the lease, constituted part of the taxable price and was therefore subject to the tax. The Tax Court thought otherwise and a majority of this Court proposes to affirm that decision. With respect, I dissent.

I recognize that great deference is to be paid to the factual determinations of the Tax Court and that *some* deference is to be paid to its legal determinations. If the Tax Court, which, despite its name, is an administrative agency and not a court, has misconstrued either a statute or a contract, however, it has made a legal error, and we are not obliged to give any deference at all to that kind of error. Indeed, we would be violating Art. 8 of the Maryland Declaration of Rights and Art. IV of the Maryland Constitution if, under the guise of deference to administrative expertise, we effectively abrogated, through delegation to an Executive Branch agency, our Constitutional responsibility to construe statutes and contracts and interpret the law.

The Majority recognizes that whether the termination fee is part of the taxable price is a question of law, but it holds that that question hinges on two subsidiary issues that it declares to be *factual* in nature—whether the termination fee was part of a sale and whether the termination agreement was part of the lease. Having declared those predicate issues to be factual ones, the Majority then simply defers to the Tax Court: end of story.

I disagree that those subsidiary issues are factual in nature. They involve either statutory or contract construction, which

are legal issues. The Tax Court treated the termination agreement as a separate transaction, wholly apart from the lease, and it is only on that premise that it was able to conclude that the termination agreement was not a sale and that the termination fee is therefore not a taxable price. As the Majority points out, the heart of the Tax Court's decision was its determination that "the clear and unambiguous provisions of the Master Lease and the Lease Termination Agreement and the lack of any transfer of title of the leased property to [Citicorp] establish that the lease termination payment was not made pursuant to a transaction that is a 'sale' as defined by § 11–101(g)."[1] I regard that as a legal, not a factual, determination—a construction of the lease, the termination agreement, § 11–101(i), and, though not mentioned, COMAR § 03.06.01.28—and one that was erroneous.

The termination agreement at issue here was a global one, of the Master Lease itself, rather than of the individual equipment schedules. It was founded on § 14.1 of the Master Lease, and it essentially said as much: "Lessee and IBM Credit Corporation ('Lessor') agree that *pursuant to the above-referenced lease agreement between the Lessee and Lessor ('Lease')*, Lessee releases all of its interest in the leased equipment indicated above . . . and Lessor agrees to discontinue such leases. . . ." (Emphasis added). The "above referenced lease agreement" was Lease Agreement No. 3269100, which identified the then-current Master Lease Term Supplement. The only authority in the Master Lease to modify or terminate it was set forth in § 14.1.

Although parties to a written contract are usually free to modify or terminate the contract by separate agreement, even if the contract purports to prohibit or condition such modifications, *this termination* clearly was pursuant to the lease. The termination agreement was contained in a separate document, but so were the various equipment schedules and other additions to and modifications of the Master Lease. That the

---

1. The definition of "sale" now appears in § 11–101(i), not 11–101(g).

parties signed a separate document does not disconnect the transaction from the Master Lease, especially when the document not only references that lease but expressly states that it is "pursuant to" it. Under § 14.1, such a modification/termination was permissible only if IBM agreed to it. IBM could, of course, have agreed without exacting any termination fee, but it was not so generous. It insisted on full payment of the rent due under the Master Lease, which had nearly 43 months more to run, although it discounted the future rent to its current value.

The Tax Court's error, and that of this Court's Majority, lies in viewing the termination agreement as a separate transaction, one in which, the Majority notes, "there was no transfer of title or possession of property to the lessee as contemplated by § 11–101(g) of the Tax General Article and Section 03.06.01.28 of COMAR." That, to me, ignores the reality of what occurred. The taxable event was not the termination. There were multiple taxable events, based on both the Master Lease and the equipment schedules. Those equipment schedules—designated as separate leases in the Master Lease—are what caused possession of the property to be transferred from IBM to Citicorp. Once those equipment schedules, which became amendments to the Master Lease, were properly regarded as sales, which everyone agrees they were, the tax became measured by "the value in money of the consideration *of any kind* required to be paid to the lessor under the terms of the lease." The termination fee exacted by IBM as a condition to its agreement to the termination under § 14.1, being the discounted value in money of the rent remaining due under the amended Master Lease, constituted consideration required to be paid to the lessor under the terms of the lease. *Ergo:* it constituted part of the taxable price. *See Residential Information Services Limited Partnership v. Rylander,* 988 S.W.2d 467 (Tex.App.1999) (termination payment taxable because it was part of entire lease).

I would reverse the judgment of the Circuit Court, which affirmed the decision of the Tax Court, and hold that the termination fee was subject to the sales tax.