63 A.3d 15

STATE DEPARTMENT OF ASSESSMENTS AND TAXATION

v.

BALTIMORE GAS & ELECTRIC COMPANY.

No. 14, Sept. Term, 2012.

Court of Appeals of Maryland.

March 22, 2013.

David M. Lyon, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for petitioner.

Harry D. Shapiro (Elizabeth A. Mullen of Saul Ewing LLP, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, McDONALD, JJ.

Opinion by McDONALD, J.

As a public utility holding a State-sanctioned monopoly on the distribution of electric power in its service area, Baltimore Gas & Electric Company ("BGE") is subject to the State

franchise tax, a gross-receipts tax levied against revenue from that activity. BGE also supplies some of the electric power that it distributes—a sphere in which it once also enjoyed a monopoly but now faces competition as a result of relatively recent State legislation designed to introduce competition into the market for the supply of electric power. This effort to introduce competition into this segment of the electricity market, in the hope that competition will benefit consumers, is sometimes referred to as de-regulation legislation.

To facilitate the transition to a competitive market for the supply of electricity, the Legislature first temporarily capped BGE's rates for the supply of electricity and later provided that consumers would receive certain credits over the period of a year to mitigate a large projected increase in those rates—credits that would be available regardless of the electricity supplier actually selected by the consumer, in order to preserve a level playing field in that market. The cost of the credits was financed by the issuance of bonds to be repaid through charges that are billed to customers over a 10-year period. The overall scheme involving credits, charges, and bond financing is known as the rate stabilization plan.

This case concerns whether, in establishing the rate stabilization plan for purposes of the transition to a competitive market for the supply of electricity, the Legislature either intentionally or inadvertently provided for the credits and charges to affect BGE's franchise tax liability—the tax related to its monopoly delivery activities unaffected by the deregulation legislation. In our view, it did not.

## Background

### *Public Utilities and the Franchise Tax*

#### *Public Service Companies*

A public utility is a natural monopoly when it is "obviously uneconomical" to have more than one provider of a particular

service or commodity.[1] The only question is who will operate that monopoly. In many instances, State and local governments make that choice by awarding a "franchise" to a particular company. The state-sanctioned monopolist is then subject to special government oversight and, in some cases, special taxes.

In Maryland, utilities are regulated under the rubric of "public service companies." *See* Maryland Code, Public Utilities Article ("PU"), § 1–101(x). Electric companies are one species of public service company and are closely regulated in certain respects by the Public Service Commission ("PSC"). PU § 1–101(h), (x); PU § 7–101 *et seq.* Respondent BGE, founded in 1816, is a Maryland corporation that provides gas and electric service to 1.8 million customers in the State and is subject to that regulatory regime.

*Franchise Tax*

Beginning with charter taxes on railroads in the 1830s,[2] taxes on the gross receipts of public utilities were widely adopted across the country. Such a tax is often referred to as a "franchise tax" as it is viewed as compensation to the public for the legal and property rights that a utility enjoys as a result of its franchise.[3] Franchise taxes have thus traditional-

---

1. Paul A. Samuelson, Economics—An Introductory Analysis (4th ed.1958) at 492. *See also* Kenneth E. Train, Optimal Regulation: The Economic Theory of Natural Monopoly (MIT Press 1991) at 3.

2. The first utility gross receipts tax was likely imposed in 1833 on the Washington section of the Baltimore and Ohio Railroad. Walter Hellerstein & Henry D. Levine, *Utility Gross Receipts Taxes and Interexchange Telecommunications Carriers*, 40 Tax Notes 529, 530 (1988).

3. *See* Walter Hellerstein & Henry D. Levine, *Utility Gross Receipts Taxes and Interexchange Telecommunications Carriers*, 40 Tax Notes 529, 530 (1988); *District of Columbia v. Chesapeake & Potomac Tel. Co.*, 179 F.2d 814, 815 (D.C.Cir.1950) ("The distinguishing mark of a public utility is its publicly-fostered insulation from competitive pressures. . . . [E]xaction of some compensation to the public in return for this monopoly grant is the avowed objective of a utilities franchise tax[.]"); *Pace v. City of Hannibal*, 680 S.W.2d 944, 948 (Mo.1984) ("A public utility, whether investor or publicly owned, requires a franchise to operate. Franchises, in addition to awarding monopoly, also regularly permit the

ly been related (in theory, at least) to the state-sanctioned monopolistic activities of a public utility.[4]

For well over a century, Maryland has imposed an annual franchise tax on public service companies. *See* Chapter 559, § 1, Laws of Maryland 1890, *codified as subsequently amended at* Maryland Code, Tax–General Article ("TG"), § 8–401 *et seq.* With respect to an electric utility, the franchise tax is calculated in part as a percentage (2%) of the gross receipts the electric company derives from business in Maryland.[5] TG § 8–403. The franchise tax is administered by the State Department of Assessments and Taxation ("Department"), the Petitioner in this case. TG §§ 1–101(g), 8–408.

The Department has provided some direction in regulation for the computation of the tax. Taxable gross receipts for distribution are derived from "all revenues included in the operating revenue accounts as prescribed by the Federal Energy Regulation Commission ["FERC"]." COMAR 18.08.01.01B(5)(a). Amounts that utilities report to FERC are thus an important starting point in the computation of the tax. Those figures are to be adjusted if "otherwise specified by Maryland law or regulation." *Id.* In addition, certain amounts are to be excluded from the figure for taxable gross receipts, as provided in the franchise tax law. COMAR 18.08.01.01B(5)(d).

### Deregulation of the Supply of Electricity—1999

The provision of electric power to a customer may be conceived of as the supply of a commodity—electric power—

---

use of public property[.] ... A franchise tax is designed, in part at least, to repay the municipality for inconvenience and expense attending the use of public property.").

4. Under standard utility rate-making principles, utilities pass through costs—including applicable taxes—to their customers, so as to minimize or avoid any impact on the company's profits or return on investment. Walter Hellerstein & Henry D. Levine, *Utility Gross Receipts Taxes and Interexchange Telecommunications Carriers*, 40 Tax Notes 529, 531 (1988).

5. A separate component of the franchise tax for electric companies is measured by kilowatt hours. *See* TG § 8–402.1.

and a service—the delivery of that power to the end user. BGE's electricity rates include charges for both electricity supply, sometimes also referred to as the sale of electricity, and electricity distribution, which is the transmission of electricity through a power grid or other delivery infrastructure to the customer. Prior to 2000, both the sale and delivery of electricity were components of one regulated rate, set by the PSC and charged by BGE as the sole provider of electric power to customers in its service area.

*Separating Supply from Distribution*

In the 1970s and 1980s, there was a movement to restructure electric utilities inspired by "increased faith in the ability of markets to achieve efficient outcomes through competition and reduced faith in the ability of governments to achieve efficient outcomes through regulation or production of service." Spence, *Can Law Manage Competitive Energy Markets?*, 93 Cornell L.Rev. 765, 770 (2008). "[E]conomists began to challenge the premise that the provision of energy service is a natural monopoly at all. . . . Delivery—transmission and distribution service—is a natural monopoly because the construction of duplicate delivery networks . . . is often inefficient. The production (and sale) of energy, however, is not a natural monopoly. We can unbundle production (and sales) from distribution so that buyers . . . can choose their energy supplier even if they must take delivery service from a monopoly provider." *Id.* at 772. That view led to the restructuring of the market for electricity in Maryland in the late 1990s. Van Nostrand, *Constitutional Limitations on the Ability of States to Rehabilitate Their Failed Electric Utility Restructuring Plans*, 31 Seattle U.L.Rev. 593, 610–19 (2008) (describing restructuring of electricity industry in several states, including Maryland).

In 1999, the General Assembly enacted legislation to convert the market for the supply of electric power in the State from a regulated monopolistic market to a less regulated, competitive one. Chapter 3, Laws of Maryland 1999. Under the de-regulation scheme, there are multiple competing suppli-

ers of electric power—the supply component. Regardless of the supplier selected by a customer, electric power is distributed to the customer through the utility with the franchise for the particular service area—the distribution component. The various electric suppliers set their own rates for the supply of electricity. An electric utility is obliged to continue to offer to supply electricity within its service area—a provision known as "standard offer service" or "SOS"—for customers who, for a variety of reasons, do not obtain service from an alternative supplier or who affirmatively choose standard offer service. PU § 7–510(c). Rates for standard offer service are set through a competitive bidding process and approved by the PSC. *Id.* Distribution rates remain regulated, as before, by the PSC.

As a result of the 1999 de-regulation law, BGE remained responsible for the distribution of electricity within its service area, although it would now be one of multiple suppliers of electricity. To temporarily ease the burden of the transition on consumers, the General Assembly temporarily capped BGE's charges for the supply of electricity—a cap that was set to expire in 2006.[6]

*Limiting the Franchise Tax to Distribution Revenues*

At the same time that it de-regulated the supply of electricity, the Legislature amended the franchise tax statute to eliminate application of that tax to revenues from the supply of electricity and to apply it only to electricity distribution revenues—*i.e.*, those derived from a utility's remaining monopoly. *See* Chapters 5, 6, Laws of Maryland 1999. In particular, the statute was amended to state that the franchise tax is assessed against public service companies that are "engaged in the transmission, distribution, or delivery of electricity or natural gas" in the State. TG § 8–402(a)(2). In addition, the definition of "gross receipts" subject to the tax

---

6. The cap originally was to last four years. *See* PU § 7–505(d). A later settlement extended a rate cap for residential customers to June 30, 2006. *In re Baltimore Gas and Electric Co.*, Case Nos. 8794, 8804, Order No. 75757, 197 P.U.R. 4TH 1 (November 10, 1999).

was amended to include gross charges "for the transmission, distribution, or delivery of electricity or natural gas or for distribution or delivery-related services," but not "gross charges from the sale of electricity or natural gas." TG § 8-401(c)(5)(i)(1), (ii)(1). As a result, the franchise tax now applies to BGE's charges for the distribution, but not the supply, of electricity. In setting the distribution rate that BGE may charge, the PSC accounts for BGE's liability for the franchise tax and embeds that cost in the rate. BGE therefore recovers the cost of the franchise tax in the distribution charges paid by its customers.

### Rate Stabilization Plan—2006

The anticipated benefits of the de-regulation legislation were slow to emerge. One commentator has described the aftermath: "When [de-regulation plans] were implemented, the general pattern ... included an initial rate reduction for various customer classes, followed by a multiyear rate freeze. The expected result was that during the rate freeze period, competition would develop and power costs would decline over time, so that upon expiration of the rate freeze, rates would not change, or would perhaps even decline. For the most part, however, the anticipated competition did not develop. Moreover, during the same period, the cost of generating power increased significantly, due primarily to increases in the costs of the underlying fuel sources. When the anticipated benefits of competition failed to materialize, states considered various options for rehabilitating their programs." Van Nostrand, *supra*, at 593–94. In Maryland, the General Assembly developed what came to be known as the "rate stabilization plan."

#### Deferral Credits Followed by Rate Stabilization Charges

In 2006, as the statutory cap on BGE's rates for supply of electricity was about to expire, BGE announced that it would raise its market-based rate for the supply of electricity by up to 72 percent. (No change was to be made in its charge for distribution of electricity, which had been set in a 1993 rate case before the PSC.) The General Assembly then convened in

a special session and enacted a rate stabilization plan to mitigate the impact of rising electricity supply rates on consumers. Chapter 5, § 1, Special Session, Laws of Maryland 2006, *codified at various provisions including* PU § 7–520 *et seq.* § 7–547 *et seq.*[7] The plan deferred the effect of market-rate pricing by essentially capping BGE's initial rate increase for the short term at 15 percent and spreading the rest of the increase over 10 years. This was accomplished by temporarily offsetting the actual increased cost of electricity supply to customers with "deferral credits" and recovering that offset in later years by including "rate stabilization charges" in subsequent customer billings for up to 10 years. PU § 7–548. In that way, the increase in electricity supply costs would be moderated and spread over a period of years.

*Making the Credits and Charges "Nonbypassable" to Level the Playing Field*

The provision of initial credits and subsequent charges to BGE's supply rates, however, had the potential to disrupt the desired competition in the electricity supply market. If the credit applied solely to BGE's supply charges, BGE's rate for electricity supply would at first be artificially lower, giving it an advantage over competing suppliers. Conversely, if stabilization charges were later imposed solely in conjunction with BGE's supply charges, BGE's rates would be artificially higher than those of competing suppliers. Customers would have an incentive—unrelated to competitive market prices—to switch suppliers initially to obtain the credit and later to avoid the corresponding charge.

To ensure competitive neutrality, BGE's rate for electricity supply needed to be stated at its competitively-determined market rate and both the credits and charges had to be "nonbypassable"—applicable to all consumers whether they

---

7. The parties have referred to the 2006 legislation in the record as "Senate Bill 1" or "SB 1," the bill number assigned to Senate version of the proposed legislation which was ultimately enacted as Chapter 5 of the 2006 Special Session. The cross-filed version of the bill was denominated House Bill 1 of the 2006 Special Session.

purchased electricity from BGE or a competing supplier. Pertinent to this issue, BGE retained a monopoly on electricity distribution within its service area and all customers, regardless of their electricity supplier, received electricity distribution service from BGE. To ensure that BGE's stated rate for electricity supply did not appear artificially high or low for the duration of the rate stabilization plan, the statute provided that BGE was to charge the full cost of standard offer service. PU § 7–524(a)(1). To prevent customers from obtaining the credits while avoiding the charges and to ensure a level playing field, the legislation directed that both the credits and the charges were to be "reflected as nonbypassable credits or charges on the electric distribution portion of each residential customer's bill." PU § 7–524(a)(2); *see also* PU § 7–548(a)(3).

*Financing the Credits*

The deferral credits would also have the effect of temporarily reducing BGE's revenues from electricity supply. The 2006 rate stabilization legislation provided a mechanism for BGE to finance its costs of electricity supply during the period that it was deprived of revenues related to that activity. The legislation provided that the PSC could authorize BGE to create a special purpose financing entity that would sell bonds to replace the forgone supply revenue. The bond debt would be repaid from the revenue stream attributable to the later rate stabilization charges. PU § 7–520 *et seq.*

*Implementing the Plan Through a Qualified Rate Order and Riders*

In accordance with the 2006 legislation, BGE applied to the PSC for a tariff to implement the plan, and for the creation of the bond-issuing entity to finance the plan. PU §§ 7–520(f), 7–523(b), 7–548(a)(4). The resulting Qualified Rate Order and accompanying Financing Credit Order (collectively, the "Order") approved the deferral of electricity supply costs and subsequent recovery of the costs through stabilization charges, as well as the application of the credit and charges to the billing of all present and future delivery customers within

BGE's service territory. Consistent with the 2006 legislation, the Order provided that the credits and subsequent charges were "nonbypassable." If a customer in BGE's service territory were to switch electricity suppliers or if another entity took over distribution services in part of BGE's service area, the charges would still be collected from the customer.

The Order also approved BGE's plan to establish RSB BondCo LLC ("BondCo"), a special-purpose financing entity to issue bonds. Revenue from the sale of the bonds would be transferred to BGE in exchange for the right to impose and collect BGE's future stabilization charges and all other rights, title, and interest in those charges (collectively called "rate stabilization property"). PU § 7–520(i); 2006 Md. PSC LEXIS 32 at *24. BGE was authorized to use bond revenue to offset its rate stabilization costs. The rate stabilization charges that it collected from customers would thereafter be transferred to BondCo to make principal and interest payments with respect to the bonds—the only permissible use of the stabilization charges.

BGE also filed two "riders" with the PSC to establish new line items on the distribution portion of customers' bills, one for the deferral credits and one for future stabilization charges. The credit was subsequently reflected on BGE's customers' bills for 2006.[8] In June 2007, through the issuance of bonds backed by BGE's pledge of the rate stabilization property, BondCo transferred $623.2 million to BGE to finance its rate stabilization costs.

The 2006 rate stabilization law did not amend the franchise tax statute. Nor did the Qualified Rate Order explicitly

---

**8.** Although the statute dictates that the credit be shown on the "distribution portion" of the customers' bills, PU §§ 7–524(a)(2), 7–548(a)(3), many of the customer bills in the record show the credit applied to the total charges in a "summary" box on the bill. In the Tax Court, BGE's director of tax planning and compliance explained that the credit appeared in the summary box due to constraints imposed by the company's computerized billing program. Apparently, the credit often exceeded the distribution charge, and the program balked at displaying a negative total distribution charge.

purport to affect BGE's distribution rates or its franchise tax liability.

### Franchise Tax Dispute

#### Initial Franchise Tax Return

Following passage of the 2006 rate stabilization law, BGE took the position that the legislation had the effect of deferring part of its franchise tax liability during the period that credits were applied to customers' bills. In its view, the stabilization credit had the effect of decreasing BGE's distribution revenue during those years and, as a result, its liability for the State franchise tax. Under this approach, its subsequent collection of stabilization charges would increase its distribution revenue in future years, thereby increasing its tax liability in later periods. In June 2006, BGE presented its position to the Department.

In a letter dated August 1, 2006, the Department rejected BGE's position. In the Department's view, the deferral credits and subsequent charges had the effect of deferring part of BGE's electricity supply revenues which, unlike distribution revenue, are not subject to the franchise tax. Further, the Department viewed the future rate stabilization charges as property of BondCo; because BondCo was not a public utility company subject to the franchise tax, the Department reasoned, neither were the stabilization charges it would receive.

On March 15, 2007, BGE filed its 2006 franchise tax return consistent with the Department's guidance—i.e., it did not offset its distribution revenues with the total amount of deferral credits.[9]

---

9. Put simply, the return computes revenues subject to the franchise tax by subtracting gross charges for sale of electricity from total operating revenues. BGE included an amount equal to the rate stabilization funds in the figure for total operating revenues and subtracted gross charges for the sale of electricity, as billed to the customer in accordance with the statute, at the full rate. As a result, the rate stabilization credits and charges did not affect distribution revenues subject to the franchise tax in the initial return filed by BGE.

*Amended Return and Refund Request*

A short time later, however, on April 25, 2007, BGE filed an amended return that updated certain items and also reflected its position on the appropriate treatment of the deferral credits and stabilization charges. In the amended return, BGE excluded $322 million from taxable revenue on the basis of deferral credits.[10] BGE claimed a refund of approximately $6.4 million.

The Department rejected the treatment of the deferral credits in the amended return. The Department recalculated the amended return and concluded that, in light of other updated items in the return, BGE actually owed an additional $115,460 in franchise tax.

*Tax Court Decision Denying Refund*

BGE appealed the denial of its refund claim to the Maryland Tax Court. The Tax Court held that, despite the statute's direction that the deferral credits were to be reflected on the distribution portion of customers' bills, the credits actually related to charges for the sale of electricity that were not subject to the franchise tax. The Tax Court further found that, under generally accepted accounting principles, the distribution revenue was certain and subject to taxation at the point it was billed by BGE. The Tax Court upheld the Department's denial of the claimed refund.

*Judicial Review of Tax Court Decision*

BGE sought judicial review of the Tax Court's decision in the Circuit Court for Anne Arundel County. The Circuit

---

**10.** In contrast to its initial return, BGE eliminated the amount related to the rate stabilization plan from the figure for its total revenues (using a figure derived, in accordance with the Department's regulations, from its recently-filed FERC Report), but did not make any similar adjustment to the gross charges for the sale of electricity. As indicated in footnote 9 above, gross charges for the sale of electricity are subtracted on the return from total operating revenues to calculate distribution revenues subject to the franchise tax. The effect of the change in the amended return was to reduce the amount of distribution revenue subject to the franchise tax by the amount of the credits—thereby implicitly using the credits to offset distribution revenues.

Court concluded that the Tax Court had misinterpreted the governing statutes, that the statutory direction to show credits and charges on the distribution portion of a customer's bill had the "unintended consequence" of affecting BGE's franchise tax liability, that the Tax Court decision would subject BGE to "double taxation," and that BGE was entitled to the claimed refund of approximately $6.4 million plus interest with respect to amounts paid for the 2006 franchise tax.

The Department appealed that decision to the Court of Special Appeals, which affirmed in an unreported decision. Although the Court of Special Appeals agreed that BGE should receive a refund, it did not adopt the rationale that the Tax Court's interpretation amounted to double taxation. Rather, it concluded that the 2006 law's direction to place credits and charges on the distribution portion of a customer's bill had the "unintended effect" of deferring taxes owed by BGE on distribution revenue.

On petition by the Department, we granted a writ of certiorari to determine whether the deferral credit affected BGE's distribution revenues for purposes of computing its franchise tax liability.

## Standard of Review

■■ Our task is to review the decision of the Tax Court.[11] The parties disagree as to what standard we should apply. The Department argues that we should accord deference to the Tax Court's interpretation of tax statutes and regulations, such as those relating to the franchise tax at issue here. BGE argues that, because the Tax Court does not typically construe the State's public utilities law, we should give its decision no special deference.

We agree with the Department that the Tax Court's construction of the franchise tax would ordinarily be presumed to

---

**11.** *See Frey v. Comptroller,* 422 Md. 111, 136–37, 29 A.3d 475 (2011) (Court of Appeals "looks through" decisions of circuit court and Court of Special Appeals to evaluate decision of the Tax Court).

be valid.[12]   However, the resolution of this dispute turns in large measure on an understanding of the 1999 electricity deregulation law and the 2006 rate stabilization law—laws that restructured the State's regulation of electric utilities, not the usual bailiwick of the Tax Court. The question here, as framed in the reviewing courts below, is whether the Legislature stumbled into an amendment of BGE's franchise tax liability while focused on rate stabilization under the public utility law. In that context, we review the Tax Court's legal conclusions without according them a presumption of correctness. *See Frey v. Comptroller,* 422 Md. 111, 138, 29 A.3d 475 (2011).

## Discussion

■   As indicated above, Maryland's franchise tax applies to an electric utility's gross charges for transmission, distribution, and delivery of electricity, but does not apply to its gross charges for the sale of electricity. TG § 8–401(c)(5). In other words, the franchise tax applies to BGE's revenue from distribution services—where it acts as a regulated, State-sanctioned monopolist—but does not apply to its revenue from the sale of electricity—where it potentially faces competition from alternative suppliers of electricity.

The central question in this case is whether the credits and charges created under the 2006 rate stabilization plan should be attributed to the distribution or supply sides of BGE's

---

**12.** The Tax Court, as "an adjudicatory administrative agency in the executive branch of state government ... is subject to the same standards of judicial review as other administrative agencies," *Frey,* 422 Md. at 136, 29 A.3d 475. Under that standard, a Tax Court ruling is "prima facie correct and presumed valid" and reviewed "in the light most favorable to it." *Comptroller of the Treasury v. Citicorp Int'l Commc'ns,* 389 Md. 156, 163, 884 A.2d 112 (2005); *see also* TG § 13–411 ("An assessment of tax under this article is prima facie correct."). Where the administrative record contains evidence that reasonably supports its factual findings, or it reaches legal conclusions regarding tax statutes and regulations that it regularly interprets, we would refrain from substituting our judgment for "the expertise of those persons who constitute the administrative agency." *Frey,* 422 Md. at 137–38, 29 A.3d 475.

business for purposes of the franchise tax. The Tax Court looked to the nature of the credits and charges to conclude that they should be attributed to the supply side of BGE's business. BGE contends that the statute, and the administrative actions implementing it, contradict that conclusion.

### *Statutory Language*

BGE argues that the plain language of the 2006 rate stabilization law treats the deferral credits and subsequent charges as part of its distribution revenue, not as a component of revenue from the sale of electricity, and thereby defers its current franchise tax liability. It relies primarily on the statute's direction that the stabilization credits and charges be located on the distribution portion of a customer's bill. It also points to a provision of the 2006 law requiring that residential customers be charged the "full cost of standard offer service." BGE contends that the location of the credits and charges on the distribution portion of the bill—together with the injunction to charge full standard offer service—affect its distribution revenues, without need for further consideration of the Legislature's purpose in directing that placement.

### *Absence of Explicit Statutory Language concerning Franchise Tax*

It is true that the 2006 rate stabilization law says plainly that the credit is to appear on the distribution portion of a customer's bill and that a bill including standard offer service is to charge the full rate. The statute says nothing, plainly or otherwise, about whether these provisions portend a change in the computation of the franchise tax or the definition of revenues subject to that tax. The 2006 law did not amend the franchise tax law, the plain language of which continued to apply to BGE's revenues from electricity distribution—its remaining monopoly franchise.

We must look to the legislative purpose.[13] That includes an examination of the statutory scheme for de-regulation of elec-

---

**13.** *See, e.g., Leppo v. State Highway Administration,* 330 Md. 416, 422, 624 A.2d 539 (1993) ("When a court is engaged in the divination of

tric supply and rate stabilization as a whole, as well as the legislative purpose for the direction to place credits and charges on the distribution portion of a customer's bill to discern what, if any, effect it has on computation of the franchise tax.

*Legislative Purpose*

There is no question that the rate stabilization plan was enacted to mitigate a projected increase of up to 72 percent in BGE's competitively-determined charges for the supply of electricity, not by any anticipated increase in the distribution rate approved by the PSC. *See* Fiscal and Policy Note (Revised) for Senate Bill 1 (2006 Special Session) at p. 5 (rate stabilization plan was for the deferral of "incremental expenses of electricity supplies"); Department of Legislative Services, *Electric Industry Restructuring–Standard Offer Service–Rate Stabilization, Executive Summary* (2006 Special Session) at pp. 4–6. The resulting statute accordingly applied a cap to "rates charged to each residential electric customer on standard offer service," PU § 7–548(b)(1), and the implementing Order specifically stated that the costs recovered by the stabilization plan were supply costs.

As the Tax Court indicated, while the 15 percent cap on increased rates imposed by the 2006 legislation applied to the aggregate of electricity supply and delivery charges, it was the electricity supply portion of BGE's rates that was increasing, not the charges for electricity delivery. The credits and charges were designed to implement the 15 percent cap by

legislative 'intent,' the key is the purpose of the legislation, determined in the light of the statute's language and context.... If the statutory language itself is insufficient to lead us comfortably to conclude what the Legislature intended, we look beyond the words to examine legislative history when it is available and the context of the legislation"); *Motor Vehicle Administration v. Lytle,* 374 Md. 37, 57, 821 A.2d 62 (2003) ("The language of a statute cannot be divorced from its context.... In short, the statutory language must be construed in light of and governed by its context within the overall statutory scheme"); *Nesbit v. GEICO,* 382 Md. 65, 77, 854 A.2d 879 (2004) ("[W]hen a statute is silent as to a particular issue, it is appropriate for the Court to consider legislative history").

first offsetting, and later recovering, any charges in excess of that cap—*i.e.*, the anticipated increases in the charges for electricity supply in excess of 15 percent. The rates that were being stabilized under the plan by means of credits and charges were not the rates for distribution, but rather the rates for supply.

There is no indication that the General Assembly intended to affect the operation of the franchise tax. For example, there is no mention in the legislative history of any effect on the franchise tax in the Fiscal Note or other legislative materials in which a bill's revenue and other fiscal effects are typically explained.[14] Nor does BGE point to any reason that the Legislature decided to provide it with a tax benefit related to its distribution revenues when it was focused on the rising costs of energy supply.

*Placement of Credits and Charges on a Customer's Bill*

The placement of the credits and charges on the distribution portion of customers' bills was to make them "nonbypassable"—to ensure that they reached all customers in BGE's distribution territory, thereby eliminating the prospect that BGE would first enjoy an artificial advantage, and later suffer an artificial disadvantage, with respect to competing suppliers of electricity. Such a distortion would severely undermine the

---

**14.** By contrast, the Fiscal Note discusses a one-time dedication of $6 million in corporate income tax revenue related to the repeal of a tax credit previously available to utilities, as well as a continuing $3 million increase in taxes collected by utilities for the Electric Universal Service Fund ("EUSF"). *See* Fiscal and Policy Note (Revised) for Senate Bill 1 (2006 Special Session) at pp. 7–8, 12. Both of those provisions involve sums considerably less than the amount of the credits and charges at issue in this case.

BGE points out that the Fiscal Note does not evaluate the impact on State income tax revenues of certain credits required in relation to its anticipated merger and charges toward the Nuclear Decommissioning Trust Fund. Chapter 5, § 6, Special Session, Laws of Maryland 2006. While there may be some merit to this contention, it is also apparent that the various income tax consequences of this bill could be quite complex, while the effect on the franchise tax, if intended as urged by BGE, would be readily ascertainable. In addition, like revenues directed to the EUSF, a change in the franchise tax would be a fiscal effect peculiar to utilities.

transition to a competitive market. In tandem with the requirement that BGE's bills display the full cost of electricity supply,[15] separation of the credits and charges from the supply portion of the bill was important in allowing consumers to make an informed choice on the selection of electricity supplier by comparing rates—a central element of the de-regulation effort.

Physical location may be indicative, but not conclusive, of the nature of an item. A grocery store that displays its aging bakery products in the produce section at the front of the store in order to render them, in another sense, "nonbypassable" does not thereby qualify a Boston cream pie as a vegetable—however desired that conclusion might be in some quarters. In the same way, the Legislature's direction to place the deferral credits and charges on the distribution portion of a customer's bill no more dictates their inclusion in franchise tax computations than BGE's failure to comply with that directive for technical reasons would dictate their exclusion from those computations.[16]

---

**15.** *See* PU § 7–524(a)(1) ("residential customers shall be charged the full cost of residential standard offer service ..."). BGE argues that this provision demonstrates that the credits and charges did not relate to its revenues from electricity supply and therefore must have related to distribution revenues for purposes of computing the franchise tax. But it appears more likely that display of the full SOS rate was intended to allow consumers to do comparative shopping when choosing an electricity supplier. While the bill was before the Legislature, competing suppliers urged the General Assembly to include such a provision. *See* Testimony of Harry A. Warren, President, Washington Gas Energy Services before Joint Hearing of Senate Finance Committee and House Economic Matters Committee, (2006 Special Session) (June 13, 2006) at p. 2 ("any proposed legislation must be drafted to explicitly require that ... utility bills of residential customers on SOS service *present* the full, actual cost of utility SOS generation supply") (emphasis added).

**16.** As noted in footnote 8 above, in many cases, BGE did not actually place the credit on the distribution portion of the bill. Rather, it was applied to the total billed amount in a "summary" section of the bill, in order to accommodate a billing system that did not contemplate a negative distribution charge. This would otherwise occur, we are advised, because, in many (if not most) cases, a customer's deferral credit exceeded the customer's distribution charge. In those cases, BGE necessarily had to offset more than the distribution charge in

Neither the line items nor the placement of the credit on the distribution portion of the bill altered the PSC-authorized distribution rate or otherwise substantively affected distribution revenues in a manner that would decrease the utility's liability for the franchise tax. Neither the franchise tax statute nor the Department's regulations treat the makeup of a customer's bill as a determinative factor in assessing the tax.

BGE notes that the credits and charges are to appear on the distribution portion of a customer's bill regardless of whether BGE or a competitor supplies the electricity purchased by the customer. But it is also true that, under the Order, the charges would still appear on the customer's bill even if another entity were to succeed BGE in transmitting electricity to the customer. The placement of the credits and subsequent charges on a customer's bill is not determinative of their relation to revenues for the supply or delivery of electricity.

### Effect of PSC Order and Riders

Any change in BGE's distribution rate must be approved by the PSC through the establishment of a new tariff. PU § 7–548(e). BGE contends that such a PSC-approved change to the distribution rate was accomplished by the two riders establishing new line items on customers' bills for the stabilization credits and charges.

The calculations made within the tariff schedule and shown on the customers' bills demonstrate, however, that the added line items have not been combined or incorporated with other distribution charges to form a new rate. After accounting for the riders, the tariff schedule lists the permitted base delivery rate, with the additional rate stabilization credit contained in a separate box labeled "RSP Charge/Misc. Credits (in Delivery Service Section of Bill)." The tariff schedule, therefore, did not treat the credit as assimilated into the delivery charge.

---

order for the customer to receive the full benefit of the credit—which is inconsistent with the theory that the credit was somehow linked for all purposes to the distribution charge.

Similarly, the underlying distribution rate is displayed in full on the bill apart from the stabilization credit. Thus, while the stabilization credits and charges indisputably alter the overall amounts billed to customers, they do not alter the underlying distribution rate. Neither the Order nor the riders modified or changed the distribution rate that the PSC permitted BGE to charge.

### Effect of the FERC Report and Franchise Tax Return

BGE argues that the Tax Court failed to take adequate account of its FERC Report and FERC accounting principles in assessing BGE's amended return. It is true that the Department's regulations implementing the franchise tax incorporate a figure for total operating revenues from a utility's FERC Report as part of the computation in the franchise tax return of the "gross charges for the transmission, distribution, or delivery of electricity" that is subject to that tax under the statute. COMAR 18.08.01.01B(5)(a). In particular, the franchise tax return form provides for a utility's "Total Electric Operating Revenues"—the figure derived from the utility's FERC Report—to be reduced by its "gross charges from the sale of electricity" (*i.e.*, revenue from the supply of electricity)—a figure not incorporated from the FERC Report—to arrive at the distribution revenues subject to the tax.

In its initial 2006 franchise tax return, which was filed prior to the availability of the FERC Report, BGE did not offset its total charges by the aggregate credits in its total operating revenues and used a figure for "gross charges for sale of electricity" that similarly was not offset by the credits. As a result, the figure for revenues subject to the franchise tax included electric distribution revenue not offset by the credit.

When it filed its amended return, BGE used a figure from its FERC Report that reduced total operating revenues by the amount of the credits, which are included in its FERC Report in a separate regulatory asset account called "Deferred Fuel Costs." [17] However, it did not similarly reduce the figure for

___

17. In the FERC Report, the supply component of total operating revenue—*i.e.*, the portion that is not subject to the State franchise tax—

"gross charges for sale of electricity"—the figure that is not derived from the FERC Report.[18] When the latter figure was subtracted from the former, the result was that distribution revenues subject to the franchise tax were reduced by the aggregate amount of the credits.

Ultimately, the application of the Maryland franchise tax is controlled by Maryland law and not by the figures in the FERC Report. In implementing that law, the Department has incorporated by reference the "total operating revenues" from that report. But the same regulations make clear that adjustments may be necessary for consistency with Maryland law and that the amounts to be excluded from total operating revenues must be in accord with the franchise tax law. *See* COMAR 18.08.01.01B(5)(a), (d). By not adjusting the figure for "gross charges for the sale of electricity" to take account of the "Deferred Fuel Costs" regulatory asset, BGE chose to relate the credits and charges to distribution revenues rather than supply revenues—a result not dictated by its FERC Report.

### Effect of Deferred Assessment

It may be that this dispute concerns only the timing of a utility's franchise tax liability, despite BGE's assertion at one point that it would face "double taxation" if the Department prevailed and the Department's assertion that BGE would escape its tax liability if BGE prevailed. If the credits and charges relate to distribution revenues, part of BGE's franchise tax liability is deferred. If the credits and charges

---

is labeled "Purchased Power." In 2006, the full amount of that item could not be passed through to customers, as the stabilization plan had capped BGE's rate increase at 15 percent. Thus, the FERC Report listed BGE's purchased power as not fully billed, but partially placed in a regulatory asset account as "Deferred Fuel Costs." This had the effect of decreasing the total operating revenue listed on the FERC Report and therefore the figure to be used in the franchise tax return.

**18.** This was consistent with BGE's position that the deferred charges in the regulatory asset account were not related to charges for the sale of electricity—a position that seems somewhat at odds with the label ("Deferred Fuel Costs") attached to the regulatory asset account.

relate to supply revenues, that part of its franchise tax liability remains current.

Such a deferral of tax liability, BGE argues, is a fair and acceptable result.[19] From that perspective, the Legislature indirectly modified the utility's distribution rates in order to stabilize electricity supply rates and the bond financing mechanism amounted to an interest-free loan financing BGE's distribution costs. But nothing in the 2006 legislation or its legislative history indicates that the General Assembly chose that indirect route. Such a consequence was no doubt "unintended" in the 2006 legislation, as the lower courts found. In our view, it was also not a consequence of that law.

### Conclusion

At the end of the day, there may be no more at stake in this case, as BGE appears to contend, than the timing of its payment of its franchise tax liability and whether deferral of that liability was an "unintended consequence" of the 2006 rate stabilization plan. But we are loath to endorse a result unintended by the Legislature and unrelated to its purpose when there is an alternative interpretation, consistent with the underlying purpose of the franchise tax and hardly at odds with the 2006 rate stabilization plan.

The General Assembly, in establishing a rate stabilization plan to offset an increase in BGE's rates for electricity supply, did not alter BGE's permitted distribution rate or distribution revenue. Nor did the statute's direction that the credit be placed on the "nonbypassable" distribution portion of customers' bills—in order to reach all of BGE's distribution customers—change the nature of the credit. The Tax Court correctly upheld the Department's decision to exclude the stabilization credits and charges from the computation of BGE's franchise tax liability.

---

**19.** BGE notes that subsequent assessment of the franchise tax would be consistent with its liability for income tax, which was—pursuant to a Financing Credit Order issued by the PSC—decreased by the credit but will increase with rising revenues once the stabilization charges are collected.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT WITH DIRECTIONS TO AFFIRM THE DECISION OF THE TAX COURT; RESPONDENT TO PAY THE COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS.